## JOHN C. HAYWARD

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa November 17, 1880.*

1. NEW TRIAL—*in a criminal case—on the evidence.* Where the testimony is conflicting on vital points, and the verdict depends upon the credibility of witnesses, the judgment of the jury should have great weight, but where, in a criminal case, the discrepancies in the testimony are not necessarily upon vital points, and upon a careful consideration of the whole evidence this court is not satisfied with a verdict finding the accused guilty of murder, a new trial will be awarded.

2. EVIDENCE—*in criminal case—cross-examination of accused as a witness.* On the trial of a person indicted for murder, it appeared the alleged offence consisted in the killing of a saloon keeper, the difficulty between the accused and the saloon keeper growing out of a dispute about a game of cards they had played together. The parties had been playing cards and drinking together in the saloon of the deceased. The dispute between them culminated in the shooting of the saloon keeper by the accused, not in the saloon, but out upon the street near the saloon. The accused was a witness in his own behalf. The matter in issue, as affecting the question of guilt or innocence, was, which was the aggressor in the affair upon the street. The accused was a young man, and was attending a medical school in the city where the killing occurred. He had been shown to have borne a good character in the neighborhood from which he came, for being peaceable and inoffensive. On his cross-examination the court below ruled that he should answer questions touching his habits, and his testimony elicited thereby showed that he had frequented other saloons in the city, where he had drank, and played cards and billiards on divers occasions. This was error, and may have prejudiced some of the jurors against the accused. These circumstances had no legitimate bearing upon the issue in the case, nor were they competent as bearing upon the credibility of the accused as a witness.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM H. BARNUM, Judge, presiding.

Mr. CHAS. H. REED, and Mr. A. L. ROCKWELL, for the plaintiff in error:

1. The verdict is against the evidence and should have been set aside and a new trial granted. This court has determined that where, in a capital case, it is satisfied that justice has not been done, though it should not appear that the jury acted rashly by deciding against the evidence, it is the duty of this court to send the cause to another jury. *Rafferty* v. *The People*, 77 Ill. 41; *Lincoln et al.* v. *The People*, 20 id. 364. And that the rule that an appellate court will not interfere to set aside a verdict, unless it is palpably against the evidence, is not applied to the same extent in criminal as in civil cases. *Falk* v. *The People*, 42 Ill. 341; *Davis* v. *The People*, 88 id. 350.

2. The court erred in allowing the prosecution, on cross-examination of the accused, to ask him how many different saloons, in the month of December, 1878, he visited and drank liquor, etc. It has been well established by the courts that where the question is not material to the issue, questions, the answers to which, though they may disgrace the witness in other respects, yet will not affect the credit due to his testimony, are not permissible on cross-examination. 1 Greenl. Ev. secs. 455 and 458; *Gifford* v. *The People*, 87 Ill. 210; *The People* v. *Brown*, 72 N. Y. 571.

Mr. LUTHER LAFLIN MILLS, State's Attorney, for the People:

The rule established in *Brown's case*, 72 N. Y. 571, is that where a witness takes the stand in his own behalf, he can, upon cross-examination, be interrogated upon matters pertinent to the issue. *State* v. *Ober*, 52 N. H. 459; *Commonwealth* v. *Mullen*, 97 Mass. 545; *Commonwealth* v. *Bonner*,

id. 587; *Commonwealth* v. *Morgan*, 107 id. 509; *McGarry* v. *The People*, 2 Lan. 227; *Connors* v. *The People*, 50 N. Y. 240.

Mr. CHIEF JUSTICE DICKEY delivered the opinion of the Court:

The plaintiff in error was convicted in October, 1879, in the Criminal Court of Cook county, upon an indictment charging him of murder, in the killing of James McMahon, on the night of December 7, 1878, and sentenced to confinement in the penitentiary for and during his natural life.

He brings the record of his trial and conviction to this court, and asks that the judgment be reversed.

As to the leading facts of the case there is but little discrepancy in the testimony.

The accused, at the time of the killing, was twenty years of age, and at the time of the trial was five feet and eight inches high, and weighed 167½ pounds. This young man, (or boy as he was styled by the deceased,) was the son of an upholsterer, whose home was in Fond du Lac, Wisconsin, where he had resided for many years. There, this young man was brought up, and his neighbors there concur in giving him an unexceptionable character for being peaceable and inoffensive.

In Fond du Lac the accused studied medicine with Dr. Bowers for about three years, and then came to Chicago to attend medical lectures, and had been thus sojourning in Chicago near two years when the killing of McMahon occurred.

The deceased at that time was, and for some years had been, a saloon keeper, was about fifty-six years old, about five feet and six inches in height, and weighed about 150 pounds. His saloon was, and had been, at the corner of 26th street and Cottage Grove avenue, being on the north side of 26th street, and on the west side of Cottage Grove avenue. His residence was in the upper rooms of the same

building.　Cottage Grove avenue intersects 26th street obliquely, bearing considerably east of south, as it extends to the southward.　The front of the saloon of deceased was on the avenue, and the building extended westward along the north line of 26th street.

At the southwest corner of these streets was the saloon of Ryan.　The relative positions of these streets and buildings will be better understood by the inspection of a diagram.

On this diagram is shown the relative location of McMahon's saloon, and that of the witness Ryan, and that of the residence of the witness Weidell; also, the tracks of the horse railroad on Cottage Grove avenue. The star at "c" is intended to show the probable position of Hayward when the first shot was fired, (according to the supposed indications or marks of the bullet on the front of McMahon's saloon;) the star at the letter "b" is intended to indicate the location of the contestants at the firing of the second shot—from the testimony of Gleason and Ryan—and the star marked "a" is intended to indicate about the place of the fourth and fatal shot—from a comparison of the testimony of Ryan, Gleason and Weidell.

The testimony shows that at the time of this transaction the accused was a medical student, attending lectures in Chicago, and that he boarded at that time within a few blocks of McMahon's saloon, and that on that night he was there, and that he and McMahon had been playing cards and drinking whisky; that Gleason, a police officer, at a little after midnight went into McMahon's saloon, and there found Hayward and McMahon alone. They had ceased their game and were standing in front of the counter, and were disputing as to whether Hayward owed McMahon some 20 or 30 cents, which McMahon claimed, Hayward insisting it had been played off at cards.

On the arrival of Gleason, McMahon went behind the counter and treated Gleason, and as soon as Gleason had taken this drink McMahon came round from behind the counter and demanded of Hayward to settle the amount. Hayward said there was nothing on him to settle for. McMahon then became violent, and at once assaulted Hayward and thrust or pushed him back three or four feet and "chucked him" up against the blinds or screen at the front door of the saloon, saying, "You get out of my place," and reaching out to catch or grab him by the shoulders. At this instant Gleason, the policeman, interposing, seized McMahon

and pulled him back, exhorting him to have no trouble about such a trifle; McMahon replying, "I want him to get out of my place," etc. Hayward offered no resistance to this assault and battery, and used no violent words, but quietly opening the front door went out of the saloon, saying to McMahon he would see him to-morrow "for this," or "about this."

Gleason testifies that in thrusting Hayward against the screen, McMahon either struck him or pushed him. Soon after Hayward left, Gleason went out of the saloon, by the side door, on Twenty-sixth street, leaving McMahon alone in the saloon closing for the night. He had turned off one gas burner before Gleason got out of the door. When Gleason had walked westward some eight or ten steps he heard a shot fired. He ran back to the corner of the saloon, and about the time he reached the corner he heard another shot and saw McMahon and Hayward in the street. They were both off the sidewalk and between the curbstone and the track of the street railroad on Cottage Grove avenue, and about thirty-five or forty feet from the corner of the saloon, but whether nearer to the curbstone than to the track witness can not tell. Hayward was backing up with his back to the eastward, and McMahon was pursuing him trying to grab him, and was within a few feet of him. Hayward was retreating with a pistol in his hand. Meanwhile, two other shots were fired, the last of which took effect upon McMahon, producing a wound of which he died.

At the time of the firing of the last shot, Hayward and McMahon were within three or four feet of each other, and Gleason was at McMahon's right hand. McMahon staggered back. Hayward fled to the north-west, pursued by Gleason, and in about seventy steps was halted by the firing of two shots by Gleason, who arrested him and took him to the police-station near by.

That McMahon was shot and mortally wounded by the fourth shot from the pistol in Hayward's hand, is not ques-

tioned. The vital question relates to the circumstances which occurred after Hayward came out of the front door of the saloon, and up to the firing of the fatal shot. No witness for the prosecution saw either of these parties after Gleason left the saloon, until about the time of the second shot. The truth of what occurred in that interval is left, by the testimony given against the accused, to inference, and very few facts shown have any bearing upon the question.

The theory of the prosecution is, that Hayward, smarting under the pain and indignity of the assault upon him in the saloon, lay in wait outside the front door, waiting for McMahon until he came out, and then, in a spirit of revenge, fired upon him, and that the vigorous pursuit of Hayward by McMahon, which followed, was for the mere purpose of disarming him, as a means of saving his own life.

The accused testifies that in the assault upon him in the saloon, he received a severe blow upon his left eye, and that after coming out of the saloon he remained on the sidewalk for a few minutes, wiping his eye; that as he turned to go to his boarding-house, McMahon came out suddenly upon him and at once rushed at him violently, saying, "Now I've got you;" that he backed off the sidewalk, drawing a revolver from his right hand pocket and fired in the air, for the purpose of intimidating McMahon; that the deceased continued the pursuit while he, the accused, rapidly retreated, the deceased all the while trying to grab him; that he fired his pistol in the air three times as he retreated, and only for the purpose of intimidation, and at the fourth shot the pursuit was so close that he aimed that shot at the left arm of deceased, with no intention of killing him, but hoping to disable his adversary. He further testifies that he knew that McMahon kept a pistol, which he had seen in the case on the counter, and that in this affair in the street he supposed McMahon had a pistol in his right hand, although he did not see it in his hand. He also testified that all this occurred in a very short time, and that

he fired at the deceased *only* because he thought it necessary to protect himself from great bodily harm.

If this be true, the killing was not murder.   Every witness who saw any part of the transaction in the street, testifies that in every stage of this transaction, when he saw the parties, Hayward was retreating and McMahon was pursuing, and appeared to be the aggressor at that moment.   Such is the testimony of Gleason, from the time he came in sight until the fatal shot was fired.   Such is the testimony of the accused.   Such, also, is the testimony of Ryan, whose saloon is on the south side of Twenty-sixth street, facing the scene.

Ryan testifies that a little after midnight he was closing his books and about to shut up his saloon, when his attention was attracted by loud talk outside, as that of drunken men. He went promptly to fasten his front door, and just as he reached the door he heard a shot.   He fastened the door and at once raised the blind of a window (beside his door,) and looking out saw persons in front of McMahon's and on the edge of the sidewalk.   There seemed to be a kind of squabble or scuffle getting out into the street.   A man in his shirtsleeves (who afterwards proved to be McMahon) appeared to be trying to grab another man.   He seemed to be doing so from the moment he first looked until they crossed over to the east side of the railroad track.   He thinks it was not over three seconds after the first shot, until he saw the parties, in front of McMahon's saloon.   At that time there were three persons, one near the building and two near the edge of the sidewalk.   The night was clear and the street lamp burning.   He could see the persons, but it was not light enough to distinguish them or tell one from the other.   He heard some talking, but could not understand what it was. He says at the second shot the parties were out on the street, and the third shot was almost immediately after the second, and at the last shot the parties were all east of the track. After he first saw them the three seemed all pretty close together—huddled together.

Weidell, who lived next door north of McMahon's saloon, and on the same side of the street, was aroused by the shooting. Two shots he heard before he got out of bed. When he got to the window he saw two men in the street, on the east side of the horse-car track, and then two more shots were fired. The men were very close together when the last shots were fired, and he thinks at that time there were four men there together.

No part of what occurred between McMahon and Hayward after McMahon came out of his saloon, until the mortal wound was given, was seen by any witness other than Gleason, Ryan, Weidell and the accused. Neither of these witnesses (except the accused) saw any part of what occurred in that interval until after the first shot was fired.

The accused testifies that McMahon was the assailant. He seems to be rather corroborated in this by the fact that McMahon was the assailant in the affair inside the saloon, and was then violent and boisterous in his assault, while Hayward was, at that time, quiet and yielded to the assault and offered no violence. McMahon, at that time, evidently *dominated* Hayward. Another corroborating fact is stated by Ryan, who heard, while in his saloon across the street, loud and boisterous words, before the first shot was fired, such as to hasten him in closing his front door to avoid intrusion by disturbers of the peace at so unseemly an hour. This is a very significant fact. It shows clearly that either the deceased or the accused, or both of them, used high words before the first shot was fired, and repels the suggestion that Hayward stealthily lay in wait and fired upon McMahon without notice of his presence.

Gleason and Ryan must have come in sight of the engagement nearly at the same instant. It was after the firing of the first shot, and probably a moment before the second shot. Gleason says the second shot was just as he reached the corner of the building. Ryan says, when he looked, there were three persons in sight, one near the building, and two

on the side walk, near its edge, and at the second shot the contending parties were out in the street. Gleason says, at the time of the second shot the parties were in the street five or six feet from the curb stone, and thirty-five or forty feet from the corner of the building. Ryan says when he looked first the three men seemed huddled close together.

It would seem, from this testimony, probable that the progress into the street was not due east, but that the line of the contest was to the north-east. A point five or six feet from the curb stone and thirty-five or forty feet from the corner of the saloon, would certainly be found decidedly north of a due east line; and the fact that though Gleason (when Ryan looked out) was in fact some thirty or forty feet from the parties, he seemed to Ryan to be very near them, indicates that Gleason was nearly on a line with them, when viewed from Ryan's window. Again, the two last shots were east of the railway track and in front of Weidell's house, which fronted towards a point north of east from the, McMahon's, front door.

To say the least, this testimony and these circumstances fail to establish that Hayward was the aggressor. After a very careful examination of all the testimony given against the accused, we are constrained to say all the testimony of the prosecution may be taken as true, and yet the accused may not have been the aggressor. In fact, on the proofs in this record, it seems rather more probable that the deceased was the aggressor in the affair in the street.

It is said that Hayward had threatened McMahon, and this because Gleason swears that on leaving the saloon he said: " Mac., I will see you to-morrow for this." Gleason undertakes to give the words of this parting remark of Hayward in four different places. He first formulates the same in the words above (page 88 of record,) and again on page 97. He gives it twice more in the same words, and in another place on the same page he testifies: "I think he said, 'Mac., I will see you about this to-morrow.'" If the phrase used

was in these words, it contains no implication of a threat, and if in the form given above, the phrase may or may not contain an implication of a threat, according to the tone and manner of its utterance, and there is no proof in this record that there was anything threatening in the tone or manner of the accused when he made the remark in question. Experience teaches that it is not safe to rely, as a general rule, implicitly upon the memory of witnesses as to the very words used in conversation.

But it is said that when first arrested he was told that he had certainly shot McMahon, and replied: "It was not my fault if I didn't," meaning (as suggested) that he intended to shoot the deceased. If this be so, it accords with his testimony, for at the trial he swears that he intended to shoot him in the left arm and wound him, but did not intend to kill him. The accused insists, in his testimony, that the phrase used was: "It is not my fault if I did," meaning that no part of the fault of the whole affair (even if the deceased was shot) was upon him.

A majority of the court, after a careful consideration of all the proofs, are not satisfied with this verdict. Where the testimony is conflicting on vital points and the verdict depends upon the credibility of witnesses, the judgment of the jury must and should have great weight, for it is the peculiar province of the jury to determine the relative credit to be given to the testimony of each witness. In this case, however, the discrepancies in the testimony are not necessarily upon vital points. All the testimony for the prosecution may be taken to have been honestly given and true, and yet Hayward may not have been the aggressor in any part of this affair. The substance of his testimony may be true without contradicting any decisive fact shown by the prosecution. We are thus led to inquire whether the record shows anything by which the jury may have been misled.

Looking further into this record we find that, on cross-examination of the accused when on the stand as a witness,

the court compelled him, against objections interposed, to testify that he had frequented other saloons in Chicago and drank, and played cards and billiards on divers times at other saloons in Chicago. This, we think, was error, and may have prejudiced some of the jurors against the accused. We can not perceive that these circumstances had any legitimate bearing upon the issue in the case, or that they were competent as bearing upon the credibility of the accused.

Upon the whole, a majority of the court are of opinion that the purposes of justice will be better subserved by having this matter submitted to the consideration of another jury.

The judgment in this case is therefore reversed, and the cause remanded for another trial.

*Judgment reversed.*

WALKER, SCOTT and SHELDON, JJ.: We do not concur in this opinion. We are of opinion the evidence fully warranted the conviction of the accused.