## UNITED STATES v. WOOD.

1. WITNESS—CROSS-EXAMINATION OF—IN HOMICIDE—RESTRICTION—HELD ERROR.

On a trial for homicide, a witness for the prosecution, being the only person present at the shooting, on cross-examination for the purpose of affecting her credibility, was asked certain questions tending to show that she had married one A. at the age of thirteen years and had never been divorced from him; that thereafter she had lived with one B. for several years as his wife, until he, becoming jealous, shot and dangerously wounded her and then shot and killed himself; that subsequently she had lived with deceased as his wife for a time, and then married him; such cross-examination being excluded by the trial court, *Held*, error.

Filed May 26, 1887.

Writ of error to the district court of Burlegh county.

The facts are fully stated in the opinion.

*Hollenbeck & Wright*, for plaintiff in error.

*John E. Carland, U. S. District Attorney*, for defendant in error.

PALMER, J. The defendant, Charles A. Wood, was indicted for murder. The indictment was in the usual form, and charged a feloneous killing. From the evidence it appears that on the night of October 16, 1885, the deceased, George Fleury,

in his own house, on the Fort Buford military reservation, was shot and killed by defendant, Wood. The defendant interposed the plea of not guilty, and insisted that he was acting in self-defense, believing his life was in danger, etc.

What may be considered substantially the undisputed facts disclosed by the evidence, and briefly stated, are as follows:

The defendant, at the time of the homicide, was a private of the cavalry guard, L troop, Seventh United States cavalry, and Stationed at Fort Buford, Dakota. He enlisted at Baltimore, Md., in May, 1883, and had been stationed at Fort Buford since the summer of 1883. He had never before been arrested nor apprehended for any crime, and had never been the subject of discipline by court-martial or otherwise, under or by virtue of any of the rules and regulations of the military service of the United States. The deceased, George Fleury, was a half-breed Indian; and had lived upon the Fort Buford military reservation all the time that defendant had been there, and was acting in the capacity of post interpreter. Mrs. Fleury was a German half-breed, 22 years old, born at Fort Union, and was married to deceased in the summer of 1885, a few months previous to the homicide. That deceased and defendant had been acquaintances, and had lived upon quite intimate terms, all of the time since the summer of 1883; and the relations between the defendant and Mrs. Fleury had been friendly all of the time since their acquaintance, a year and a half prior to the homicide.

On the evening preceding the shooting, the deceased, George Fleury, Mrs. Fleury, defendant Wood, and one Mrs. Clyde, went together from Fleury's house to a dance somewhere in the immediate vicinity, remaining at the dance until 2 or 3 o'clock the next morning. Both the deceased and the defendant had been drinking freely during the night. After the dance, the defendant, the deceased, Mrs. Fleury, and Mrs. Clyde, returned to Fleury's house, and Mrs. Clyde passed directly on to her own home. There is some conflict in the evidence whether Mr. Fleury or Mrs. Fleury went to her home with her, but the evidence is undisputed that, whichever did go, they had re-

turned, and had entered Fleury's house before the homicide. George Fleury and the defendant continued drinking after the return to Fleury's house. The entrance to the house was into the kitchen, and from the kitchen through a door to a bedroom, where the shooting was done. There were no other rooms in the house, except two sheds, one of which was occupied by a squaw called "Pug," and two papooses. There were no other occupants of the premises on the night in question, and the squaw Pug was not a witness to any of the proceedings.

The shooting was done in the bedroom. The furniture of this room at the time was a bed, wash stand, table, sewing-machine; and on the bed or table was a revolver owned and kept by deceased, and, standing in one corner of the bedroom, was a Winchester rifle, also owned and kept by deceased. At or immediately preceding the shooting the deceased, Mrs. Fleury, and the defendant, were alone together in the bedroom. Just before any shots were fired, Mrs. Fleury ran from the room, and, after the shots were fired, the defendant likewise made his escape. Fleury is supposed to have died almost instantly; certainly he was dead when he was first examined, a few moments later. ·

It will thus be observed that the only living witness to what happened on that occasion between the defendant and the deceased was the defendant himself and Mrs. Fleury.

The direct evidence relied upon by counsel for defendant to establish his theory of self-defense is that of the defendant himself, and is substantially as follows, as to what occurred in the bedroom: "After I arrived at the house, Mrs. Clyde and Mrs. Fleury went down to Mrs. Clyde's, and George Fleury and myself went into the house, and the quarrel took place there. Question. State what you mean by a quarrel; state all that happened. Answer. When I went in he said to me that I was a nice kind of a fellow to let that man dance with his wife in the way he did; and I asked him why; and he said I was bad as he was. Charles Foster I think is his name. I told him I did not think there was anything wrong between his wife and Foster. Q. Was Mrs. Fleury there then? A. No, sir. He said there

was a man told me—Carland. How long before the shooting took place? A. About ten minutes. He said: 'When I was down here at Bismarck after some horses, when I came back a man told me you had been committing adultery with my wife every night while I was away.' I asked him could he prove it. He said he did not need any proof He said one was as bad as the other; and about that time Mrs. Fleury came in. She sat down on the bed and commenced taking off her shoes. She said to her husband; 'George, Fleury—' Mr. Carland. Is that a competent conversation? Court. It seems that only what passed between defendant and Fleury would be competent. Q. Did you shoot Fleury that night after the ball? A. I did. Q. What did you shoot him for? A. Because he threatened to kill me. Q. What position was he in, and what did he say? A. He said, 'You son of a bitch, I'll blow your head off.' He was sitting on the bed, and jumped to the corner, and grabbed the Winchester rifle. Q. After he grabbed it what did he do? A. He pointed it at me. Q. Did he say he would blow your head off. Did you believe it? A. Yes, sir. Q. What did you do? A. I immediately jumped for the door, and struck against the sewing machine, and when I jumped back against it my eye fell on the revolver, with the handle out of the basket. Q. What did you do? A. I fired. Q. Right away? A. Yes, sir. Q. Why did you fire? A. Because he was aiming the gun at me. Q. And you believed he was going to kill you? A. I thought my life was in danger. Q. Did you aim? A. No, sir; I did not. Q. How did the room appear as soon as you fired? A. The smoke came in my face, and I could not see. Q. Did you say how many times you fired? A. No, sir. By the report of the shots, I could not tell whether he was firing or whether I fired. Q. Did you try to get out of the house before you fired? A. Yes, sir; I did. Q. How many times do you think you fired, Mr. Wood? A. I have no idea how many times I fired. Q. As soon as you finished firing what did you do? A. I ran out of the house. Q. Did Mrs. Fleury go out of the room before you fired? A. I do not remember how she got out. * * * Q. Now, whose revolver did you use, in fact? A. I cannot

say whose it was.  Q.  You found it in Fleury's house?  A. Yes, sir.  Q.  It was not yours?  A.  No,  sir.  Q.  Had you ever seen it on Fleury before?  A.  I had seen him with one like it, but I cannot say that it was the one.  Q.  What became of it after you used it?  A.  I threw it down as I ran out of the kitchen.  Q.  Where did you throw it?  A.  I do not remember.  Q.  Inside or out?  A.  I guess it was inside the kitchen."

And upon cross-examination Wood testified as follows: "Question.  When you got into the kitchen, which way did you go?  Answer.  Went into the bedroom.  He went in first, and sat down by the table.  Q.  Where did you go?  A.  I stood along side of him.  Q.  What did you do there, if anything?  A.  I moved from there to the bed on the left hand side of him.  He wanted me to take a drink of whisky, but I did not do it.  Q.  Mrs. Fleury was not in the room?  No, sir. Q.  How long did you stay in that position?  A.  Until Mrs. Fleury came in.  Q.  How long afterwards did she come in? A.  About twenty-five or thirty minutes.  Q.  And during all that time you and Fleury sat there talking friendly and drinking?  A.  We were not talking friendly.  Q.  What were you talking about?  A.  About the dance.  Q.  Where were you sitting?  A.  I moved.  Q.  Were you sitting in a chair?  A. I do not remember.  Q.  Where was he?  A.  He then sat by the table.  Q.  Was he sitting in a chair?  A.  He was.  Q. You do not know where you were sitting?  A.  I do not know whether I was sitting or standing.  Q.  Was Fleury in this position when she came in?  A.  Yes, sir.  Q.  Where did she go? A.  She came in and sat down on this end of the bed, and commenced taking off her shoes and stockings.   Q.   What happened then?  A.  He started to quarreling with his wife as soon as she came in.  Q.  What did she say?  A.  She said we were a nice kind of a people to go to a dance, and tell about this business that happened; and he said she was nothing but a prostitute.  Q.  What did you say to him?  A.  I just asked him to prove it, and he said it did not need any proof. He said, 'You son of a bitch, I'll blow your head off.'  Q.  Was he sitting at the table?  A.  He was.  Q.  What was he doing?

A. He was sitting at the table talking to me at the time. Q. Where were you sitting? A. I do not remember whether I was sitting or standing; I was on the left of him by the bed. Q. Were you between the bed and the table? A. I think I was. Q. Where was Mrs. Fleury? A. She was sitting on the corner of the bed. Q. When he said that, what did he do? A. He jumped from the table into this corner. Q. What was in that corner? A. A Winchester rifle. Q. What did Mrs. Fleury do then? A. Just as soon as he said he would kill me, she jumped and rushed for the door. Q. Why did you not go that way. A. Because he crossed me. Q. If you stood there, and jumped for the gun, could not you jump? A. The gun covered me, and I could not do anything. Q. Where was he when he had you covered? A. In the corner. Q. Where were you when he had you covered? A. By the sewing machine. Q. What made you stop? A. Because when I jumped I struck against the machine. I could not jump any further. I got as far as I could till I saw the Winchester; and my eyes fell on the basket. Q. And you picked up the revolver, and commenced shooting. A. A. Yes, sir. Q. Was the gun pointed at you before you saw the revolver? A. I think it was. Q. And he held the gun on you all the time until you got the revolver and shot him? A. Both jumps were made at the same time. I jumped to the machine, and he jumped to to the corner to get his gun. Q. Do you pretend to say that George Fleury, if he jumped over there to get that gun, and once had it leveled at you, that you could have shot him? A. Yes, sir; the gun was drawn on me before I shot him. Q. It was drawn before you got it? A. He grabbed the Winchester, and when the Winchester came up I got to the basket; it was coming up at the same time. Q. You saw him with a Winchester aimed at you? A. I saw the Winchester coming up, and took the revolver out of the basket and shot him. Q. Did you do it in a hurry? A. I did as quick as I could, because I thought my life was in danger. Q. Well, Fleury did not shoot at all, did he? A. I thought he did. I thought he was shooting at me at the same time. Q. How many times did you shoot? A. I do not know. Q. What

made you quit firing? A. I was in a hurry to get out of the house. Q. Court. Did you fire all the shots out of the revolver? A. I did not look at it. Q. Where was Mrs. Fleury sitting when Mr. Fleury jumped for the Winchester? A. When he said he would blow my head off she ran out of the door. Q. Which way did Mrs. Fleury go? A. She went before any of us started. Q. You say she was there when he said that? A. Yes, sir. Q. What was there over there to jump from? A. I did not know whether the man was going to hit me with his first or shoot me till he had the Winchester in his hand. Q. When did you first discover the revolver in the basket? A. When I jumped against it. Q. Which hand did you take the revolver with? A. I cannot say which hand I did the shooting with. Q. Court. Are you left-handed? A. I am. Q. Where was he when you fired the second shot. A. I do not remember anything about the second shot. Q. Which direction did you fire? I did not take any aim at all. I do not know where I was firing. I did not take any at him. Q. Did you shoot in that direction? A. I presume I did. Q. Then you did not see him at all after you fired the first shot? A. No, sir. Q. Did Mrs. Fleury cross the center of the room before you did? A. Well, I know she got out of the house; but I don't know who got in the center of the room first? Q. You was just as near the door as she was? A. No, sir. Q. Why? A. Because she started before I did. She made the first move. Q. When you got through this firing, you went out this door? A. Yes, sir. Q. You did not see Fleury at all; you saw the gun, and you thought it was pointed at you, and you commenced firing? A. I saw him when he first jumped and grabbed for the gun, and was raising it up. Q. You did not see him again? A. No, sir. Q. You did not see him fall? A. No, sir. Q. You did not? A. No, sir.

As corroborating this branch of the defendant's testimony, Dr. Johnson, assistant surgeon of the United States army, and a witness for the prosecution, testified as follows: "I was notified about three o'clock in the morning on the seventeenth of

October, 1885, that George Fleury, post interpreter, had been shot. I arrived at the quarters in about ten minutes, and made an examination of the body later in the day. Question. Doctor, what fire-arms, if any, did you see in the room there? Answer. I saw a Winchester rifle and a revolver. Q. Where was the rifle when you first saw it? A. I am not positive as to its exact location. Q. Court. As near as you can remember. A. My impression is that it was right by the door, as you enter the room. Q. Did you notice anything else close to the body. Did you notice a cartridge belt? A. I noticed a cartridge belt. Q. Where was it? A. It was underneath him. He was lying on it. Q. It was fastened to him, was it?. A. No, sir. Q. Were there any cartridges in it? A. It was nearly full. There were a few empty shells, with primers in one end of the belt, and there were two cartridges out. Q. Did you make any examination of the floor of the room to ascertain if there were any empty shells or cartridges before you removed the body? A. I found the belt underneath the body apparently loaded, and there were two cartridges on the floor beside him. Q. Were these two cartridges everything in the shape of ammunition that you found on the floor? A. There was a belt mostly filled with cartridges. Q. State whether or not you saw any discharged shells on the floor. A. I did not see any discharged shells on the floor."

Sergeant Bryant, also a witness for the government, who was the officer in charge of the guard who took possession of the building immediately after the shooting, testified as follows: "Question. You also entered the bedroom? A. Yes, sir. Q. Did the other members of the guard follow you into the bedroom? A. Yes, sir. Q. What was then done by you? A. I went over to see if the man was dead. It was rather dark in the corner, and I took the lamp off the table. Q. Was the light burning? A. Yes, sir. I went over near the body, and found the rifle lying near the washstand. It lay right close to him. I saw that the man was dead, so did not disturb him. Q. Did you remain in the room all the time, till the doctor came? A. Yes, sir. Q. Was the body disturbed in any manner? A. No, sir. Q. Did you do any-

thing with the gun? A. Yes, sir; I picked it up and set it against the side of the building. Q. Was Fleury's head lying between the partition and the washstand? A. Yes, sir; and the gun laid between the washstand and Fleury? Q. State what, if anything, you saw of a cartridge belt? A. I saw the belt lying under him when he was removed. Q. Was it buckled or was it loose. A. It was loose. Q. Did you see any cartridges there? A. Yes, sir. Did you see any loaded cartridges there that were out of the belt? A. Yes, sir, two. Q. Which side of Fleury? A. One on the floor near the washstand, and one was under him."

George Rostrander, one of the guards accompanying Sergeant Bryant, after describing the location of the body, testified as follows: "Question. What else did you observe in the room A. I saw a gun lying at his left side. Q State how it was sitting? A. With the butt towards him, and the barrel along the floor. Q. Towards what portion of his body? A. Lying on his lefthand side. Q. Was it a rifle? A. Yes, sir. Q. It laid close to the left side, you state. A. I should think about a foot. Q. Did you notice anything else there,—a cartridge belt, or anything of that kind? A. The sergeant took the gun up, and placed it at the other side of the room. I assisted the doctor to lay the body out in the center of the room, and then saw the belt underneath him. It was nearly full of cartridges. There were two out of the belt,—one almost under him, and another a little to the left of him. They had not been exploded."

James Hogan, the other guard who accompanied Sergeant Bryant, testified as follows: "Question. Did you observe the gun? A. Yes, sir. Q. State where it was? A. When I went into the room he was lying in a sitting position, his hand was across his breast, and his belt was on, but unbuckled. His Winchester rifle lay with the breach open, and two cartridges on the floor,—loaded cartridges."

The only other material evidence presented by the record, and contradictory of that above set forth, was that of Mrs. Fleury, and is in substance as follows: "Question. State who

went into the house first when you went back. Answer. Wood. My husband took Mrs. Clyde down to her house. I went directly into the kitchen, and then into the bedroom. My husband came about five minutes after. He went into the bedroom. I was sitting on the foot of the bed, taking off my shoes. My husband came in and took off his coat, and sat down by the table. I went to the head of the bed, where the revolver was, and that was gone. Wood came in right behind my husband. He stood right inside the bedroom door. C. Who spoke first? A. Wood did. Q. What did he say? A. Oh, he was quarreling with me about the dance. While me and him were quarreling, my husband said the dance was over, and to quit quarreling about it. Before my husband told Wood to quit quarreling, he asked Wood to take a drink. Wood took the bottle and drank, and handed it back to my husband, and stepped back to the door. He said to quit quarreling about the dance, and got up and walked over by the washstand. I told Wood to go to bed, and he would feel better. He said he would make me suffer for it, and he pulled out a revolver. I told my husband, 'Look out for yourself, George,' and ran out. I heard two shots fired when I ran out the kitchen door. My husband was standing by the washstand. He had his back to me, and I told him to look out. I saw Wood at that time. He pulled the revolver out of his pocket; out of his right-hand pants pocket. I ran out before he commenced firing. I heard the shots fired as I ran out the front kitchen door. Wood stood right in the door between the kitchen and bedroom. I should think it was four or five yards from the door where Wood stood and the kitchen door I went out of when I heard the shots. It did not take me a second to go out. I went as fast as I could. I recognize the revolver as the one owned by my husband. I heard two or three shots fired, but no more. I was quite a little ways from the door when the last shot was fired. The shots were fired in quick succession, near together. Q. After your husband and Wood both came into your house, what, if anything, did your husband say about your conduct at the dance? A. My husband did not say anything about my conduct. Q. Did he not

charge you with improper dancing with Foster? A. No, sir; he did not. Q. What occasioned the disturbance between your husband and the defendant? A. There was no occasion at all, that I know of. Q. Mrs. Fleury, did you see any shots fired in the house? A. No, sir; I heard them. Q. There was very little conversation took place between your husband and Wood? He said the dance was over, and for us to quit quarreling about it. Q. Then you and Wood had been quarreling about it? A. Because I would not dance with him. Foster's name was not mentioned that night, neither by me or my husband.

The above is substantially all the evidence in the case as what occurred in the bedroom on the occasion of the homicide. I have quoted it fully because of its importance in determining the question of justification, and because of its importance in determining, to my mind, the only question error in the case. The only two living witnesses have thus detailed what was said and done at that time. Practically, upon their testimony, the jury were required to determine the important question whether Wood was guilty of murder, or whether his act was justifiable; and, in the performance of their sworn duty in judging of the weight of evidence, and the credibility of witnesses, they accepted the story of the woman, returned a verdict of guilty, and Wood was sentenced to execution.

We may assume (but from a very careful examination of the record I must confess it a very violent assumption) that there was on the face of the record sufficient evidence to warrant the trial court in submitting the question of murder to the jury; but with that submission it was of the utmost importance that the jury should be furnished with all the light legally possible concerning the character of the witness they were thus asked to believe; and, to my mind, the cases to be found in the books are rare where such an important question was presented and in like manner determined, and attended with such fearful consequences, where, upon the trial, the door was closed which separated the past moral character of the single witness for the prosecution (who was present at the time the offense was

committed) from the view of the trial jury. Mrs. Fleury was that witness. She it was on whom the prosecution must rely for a conviction. Upon her testimony the government relied to overcome the evidence of justification presented by the defendant, with its strong corroborating circumstances. The measure of her testimony in the legal balances, as weighed by the lawfully constituted tribunal, was conclusive of this case, and determined the question of life or death to Charles A. Wood. She was placed upon the witness stand and fully examined by the attorney for the government, and upon cross-examination, for the purpose of letting in a ray of light whereby the jury might know something of her credibility, more than appeared from her mere description of the death scenes of her husband, the attorney for the defendant upon cross-examination asked the following question: "Question. Who was your last husband before Fleury?" This was objected to and the objection sustained by the trial court. Counsel for defendant then offered to prove by the witness that she (Mrs. George Fleury) "was married to one Aat when she was 13 years of age, and that she had never been divorced from him, nor he from her; that after she lived with Aat she lived with another man by the name of Bot, as man and wife for several years; that, by reason of her conduct Bot became jealous and shot her upon the left cheek, where she now bears the scar, and then killed himself; that she subsequently said that he would have killed her if she had not played possum, and pretended to be dead; that she subsequently lived with Fleury until last fall as man and wife, when they were married, by reason of rules and regulations governing persons residing on military reservations." This offer was unqualifiedly rejected by the trial court, to which ruling the defendant saved an exception, and its exclusion is assigned as error, and to my mind is the only error in the case preserved by the record.

In People v. Manning, 48 Cal. 337, the court says: It is the peculiar providence of the jury to weight the evidence and decide upon the credibility of witnesses." With the well-nigh universal system of jury trials in the several states of the

union, it is hardly necessary, for the benefit of the profession, that the above doctrine be enunciated in the case law of the country. But how are the jury to judge of the credibility of witnesses who appear before them in the witness box,—who are perhaps there seen for the first time? Are they to believe them credible because their story is told glibly? Any prattler could do that. Is it because they have adhered closely to the leading features and points of their story, and thus avoided over-- throw by rigid cross examination? The greatest rascals in the land do that. Is it, perchance, because the witness is a woman perhaps gaily attired and beautiful to look upon? We may well believe the first known character who figured in criminal history 6,000 years ago fully met all these conditions. But we may safely assume that while all these qualifications, or the want of them, may and should be considered by the jury in forming their estimate of the value of testimony, yet they are entitled to more.

It did appear from the evidence (perhaps by accident) that the witness in this case, Mrs. Fleury, was an Indian half-breed, born at one of the government forts of this country. Further than that the jury must have been governed entirely by impressions, good or bad, conceived from her temporary ap-pearance before them as a witness. What the opportunities are for persons of this class, at a military post, on a govern-ment reservation, to develop the finer instincts, and all the bet-ter elements of the moral character, of men and women, I am not advised. It might, however, be safely presumed that the frontier and military posts of the country are not pre-eminently the places best fitted for the development of those traits of character which constitute true man and womanhood. At all events I may safely say that the kind offices of our government which have been bestowed upon the half-breeds of the country for the education and development of their higher moral char-acters, has not become so marked and distinctively character-istic as to warrant (in my opinion) the courts of this territory in taking judicial cognizance of it as an established fact; there-by closing to trial jurors in criminal cases the avenues to infor-

mation and light upon the subject of character of those whose word they are asked to believe, especially where the conclusion which they reach may, as in this case, mean death.

I am aware that the evidence which was rejected in this case was of that class which would expose the witness to disgrace, and thereby lessen the value of her testimony. That was the purpose of the offer, and it was a legitimate purpose, and I think well established by authority in England and especially in this country. What good reason can be given why the testimony of one witness who has reached perhaps the highest point of development in his mental, social and moral nature, and who has all his life striven to make the very highest use of every faculty with which the Almighty has endowed him, and who has all his life striven zealously to keep, and truly observe, every known law, human and divine,—why, I ask, should jurors, sworn to an honest performance of a particular duty, be required to accept the testimony of such a witness as only equivalent to another whose birth may have been, in point of time, uncertain; parentage doubtful; childhood obscure; associations primitive; manhood dwarfed; with mental development untouched, and moral character benumbed? If the villain who has, through his associations with outlaws, acquired such a degree of smartness that he can, upon the witness stand in a court of justice, appear pert and cunning, and have the courts of the land draw the veil between himself as an outlaw and guerilla upon society, then indeed are courts of justice a misnomer, and little protection will lie in those tribunals for either property or life. Such is not the law of the land, as established by either precedent or reason.

The language of the learned HUNT, J., in Shepard v. Parker, 36 N. Y. 517, is not only pertinent as applied to the case at bar, but it also glitters with reason, and, if the true principle there enunciated was oftener applied in courts of justice they would become less frequently courts of injustice. With reference to this class of evidence sought on cross-examination of a witness the learned judge says: "The evidence was competent for the purpose of impeaching the witness. It

is the constant practice at the circuit, to inquire of a witness if
he has not been guilty of a specific offense, for the purpose of
impeaching him.    It is usually a satisfactory test.    If a man
admits himself to have been guilty of heinous offenses, the jury
would justly give him less credit than if his life had been pure
and his conduct upright.    If a female witness admits herself to
have broken down those barriers which the virtue and religion
of every civilized country have reared for her improvement and
protection, her oath would be of little value before a jury of in-
telligent men.    This practice is uniform and fully sustained by
the authorities.''

That the accepting or rejecting of this class of evidence in
whole or in part, is largely discretionary with the trial court,
may be admitted.    That, unless the rejection of this evidence
was an abuse of judicial discretion, no error was committed in
the case, may also be admitted.    The immediate circumstances
attending the shooting appear above in the evidence.    The
defendant and Mrs. Fleury are the only living witnesses of
that scene in the bedroom.    The defendant, "a stranger
in a strange land," is on trial for his life.    His direct and
positive testimony as to what occurred instantly preceding
the shooting was as follows:    "He (George Fleury) said: 'You
son of a bitch, I'll blow your head off.'    He was sitting on the
bed, and jumped to the corner, and grabbed the Winchester
rifle.    He pointed it at me.    I immediately jumped for the door.
Struck the sewing machine.    My eye fell on the revolver, with
the handle out of the basket.    I grabbed it and fired.''    Mrs.
Fleury's testimony of the same scene is as follows:    "He
(George Fleury) said to quit quarreling about the dance, and
got up, and walked over by the washstand.    I told Wood to go
to bed and he would feel better.    He said he would make me
suffer for it, and he pulled out a revolver.    I told my husband,
'Look out for yourself, George,' and I ran out.    I heard two
shots fired when I ran out of the kitchen door.    My husband
had his back to me, and I told him to look out.    I saw Wood at
the time he pulled the revolver out of his pocket—his right
hand pants pocket.    I ran out.    I heard the shots fired as I ran

out of the kitchen.   Wood stood right in the door between the kitchen and the bedroom."

A moment's inspection of the above testimony of the defendant, if believed by the jury, would be well nigh conclusive that the only way to account for the defendant's continued existence is that he saved his own life by necessarily taking that of Fleury.   Especially would this seem to be so when we consider the other evidence in the case, that by the side or Fleury's dead body lay the cartridge belt, full of loaded shells, with two shells withdrawn, and as the witness Hogan, who was one of the first upon the scene after the shooting, testified: "His Winchester rifle lay by his side with the breech open, and two loaded cartridges withdrawn from the belt, and on the floor." Upon the other hand, the jury may well be said to have been warranted in returning the verdict of guilty of murder, if, instead of believing such evidence, they believed the testimony of Mrs. Fleury that the defendant drew the revolver from his own pocket, with a threat, and fired two or three shots instantly, and in quick succession, thereby slaying her husband without the least provocation on his part.   It is, indeed, difficult to imagine a case where the credibility of witnesses should cause trial jurors greater solicitude.

No principle is more firmly established than that previous good character of a person charged with crime is competent evidence to be considered by the jury in passing upon the question of guilt or innocence.   But it is strenuously insisted that a man's life may be judiciously sacrificed upon the testimony of witnesses whose own private character (vile and sinful though it may be) is too sacred for inspection, by those whose duty it is to give to it such, and only such, weight as it is entitled to receive in the courts of the land.   The evidence offered was rejected by the trial court when, to my mind, the importance of the evidence, the importance of the case, the magnitude of the offense charged, with the possible corresponding penalty, all demanded that it should have been admitted.

While it may well be said that the authorities in this country are not in entire harmony upon the question as to how far

the courts are bound, in the exercise of a sound discretion, to permit the examination of a witness as to matters having a tendency to degrade the character, still, whenever the question has been squarely presented, as in this case, there has been, as in the case of Shepard v. Parker, *supra*, no uncertain sound.

In speaking of the admissibility of this class of evidence, PECKHAM, J., in LaBeau v. People, 34 N Y. 233, uses this language: "I wish to say that in my opinion, as a general rule evidence on cross examination, tending to impeach the credibility of a witness, should be rejected with very great caution; its exclusion can rarely be proper."

In Newcomb v. Griswold, 24 N. Y. 298, ALLAN, J. says: "In the latitude of cross-examination, and to enable the jury to understand the character of the witnesses they are called upon to believe, collateral evidence is allowed from the witness himself tending to discredit and disgrace the witness·under examination."

The same question was again before the court of appeals in the state of New York in Real v. People, 42 N. Y. 270; and seemingly that trial courts might no longer have excuse for closing the door against this class of evidence, GROVER, J., presents an elaborate discussion of the question, and in his usual vigorous manner. And it would seem reasonable to suppose the question was, for the present at least, settled in that state that, while the subject was still left with the trial court as a discretionary question, yet that discretion should generally be used in the direction and expansion, rather than contraction, of the avenues leading to this subject of past moral character. The court in that case says: "It is well settled that, for the purpose of impairing the credit of a witness, by evidence introduced by the opposite party, such evidence must go to his general character. * * * It is held, for the purpose of discrediting his testimony, the witness may be asked, upon cross-examination, as to specific acts. This shows that upon a cross-examination of a witness, with a view of testing his credibility, inquiries are proper as to facts not competent to be proved in any other way. * * * In such examination the presumption

is strong that the witness will protect his credibility, as far, at least, as truth will warrant. All experience shows this to be so. It would be productive of great injustice, often, if, where a witness is produced of whom the opposite party has before never heard, and who gives material testimony, and from some source, or from the manner and appearance of the witness, such party should learn that most of the life of the witness had been spent in jails and other prisons for crime, if this fact could not be proved by the witness himself, but could only be shown by records existing in distant counties, and perhaps states, which for the purposes of the trial are wholly inaccessible. No danger to the party introducing the witness can result from this class of inquiries, while their exclusion might, in some cases, wholly defeat the ends of justice. My conclusion is that a witness, upon cross-examination, may be asked whether he has been in jail, the penitentiary, or state prison, or any other place that would tend to impair his credibility, and how much of his life he has passed in such places."

The same question was before the supreme court of Michigan, (Wilbur v. Flood, 16 Mich. 40,) and CAMPBELL, J., in speaking for that tribunal, says: "It has always been found necessary to allow witnesses to be cross-examined, not only upon the facts involved in the issue, but also upon such collateral matters as may enable the jury to appreciate their fairness and reliability. To this end a large latitude has been given, where circumstances seem to justify it, in allowing a full inquiry into the history of witnesses, and into many other things tending to illustrate their true character. This may be useful in enabling the court or jury to comprehend just what sort of a person they are called upon to believe, and such a knowledge is often very desirable. It may be quite as necessary, especially where strange or suspicious witnesses are brought forward, to enable counsel to extract from them the whole truth on the merits. It cannot be doubted that a previous criminal experience will depreciate the credit of a witness to a greater or less extent, in the judgment of all persons, and there must be some means of reaching this history. The rules of law do

not allow specific acts of misconduct, or specific facts of disgraceful character, to be proved against a witness by others. * * * Unless the remedy is found in cross-examination, it is practically of no account. It has always been held that, within reasonable limits, a witness may on cross-examination, be very thoroughly sifted upon his character and antecedents. * * * We think a witness may be asked concerning all antecedents which are really significant, and which will explain his credibility. * * * He must be better acquainted than others with his own history, and is under no temptation to make his own case worse than truth will warrant. There can with him be no mistakes of identity. If there are extenuating circumstances no one else can so readily recall them. We think the case comes within the well-established rules of cross-examination, and that the few authorities which seem to doubt it have been misunderstood, or else have been based upon a fallacious course of reasoning, which would, in nine cases out of ten, prevent an honest witness from obtaining better credit than an abandoned ruffian."

Again, in Foster v. People, 18 Mich. 265, the same learned jurist had occasion to again refer to this class of evidence, and said: "The quality of such testimony can never be regarded as entirely separated from the character which is indicated by their crimes; and, if the position they occupy indicates moral turpitude; there is a necessity for more thorough cross-examinetion, and nothing ought to be shut out which can sensibly aid in explaining their credibility, unless there is some fixed rule of law that excludes it."

In 1 Greenl. Ev. (14th Ed.) the learned author, while recognizing the fact that the courts are not in perfect harmony upon the subject, uses the following very pertinent language in announcing a proposition of elementary law: "There is certainly great force in the argument that, where a man's liberty or his life depends upon the testimony of another, it is of infinite importance that those who are to decide upon the testimony should know, to the greatest extent, how far the witness is to be trusted. They cannot look into his breast to see what

passes there, but must form their opinion on the collateral indications of his good faith and sincerity. Whatever, therefore, may materially assist them in this inquiry is most essential to the investigation of truth; and it cannot but be material for the jury to understand the character of the witness whom they are called upon to believe, and to know whether, although he has not been convicted of any crime, he has not in some measure rendered himself less credible by his disgraceful conduct. The weight of this argument seems to have been felt by the judge in several cases in which questions tending to disgrace the witness have been permitted in cross-examination. * * * Nor does there seem to be any good reason why a witness should be privileged from answering a question touching his present situation and employment and associates, if they are of his own choice; as, for example, in what house or family he resides, what is his ordinary occupation, and whether he is intimately acquainted and conversant with certain persons, and the like; for, however these may disgrace him, his position is one of his own selection. * * * * * * The state has a deep interest in the inducements to reformation held out by the protecting veil which is thus cast over the past offenses of the penitent, but where the inquiry relates to transactions comparatively recent, bearing upon the present character and moral principles of the witness, and therefore essential to the due estimation of his testimony by the jury, learned judges have of late been disposed to allow it.

Applying these rules to the facts as presented in the case at bar, we are of the opinion the evidence offered was competent, and its exclusion was error, for which the judgment must be reversed, and a new trial ordered.

FRANCIS, J., dissents, and CHURCH, J., did not sit in the case.