(June 15, 1916.)

## STATE, Respondent, v. FONG LOON, Appellant.

[158 Pac. 233.]

HOMICIDE—DYING DECLARATION—INTERPRETER AS WITNESS—ADDICTION OF WITNESS TO USE OF DRUGS—ADMISSIBILITY OF EVIDENCE TO SHOW CREDIBILITY OF WITNESS—CROSS-EXAMINATION—HEARSAY.

1. Where the victim of a homicide was a Chinaman unfamiliar with the English language, and his purported dying statement was interpreted by a Chinese interpreter and taken down in shorthand by a stenographer, evidence of the fact that the interpreter was addicted to the use of opium or other drugs was competent for the purpose of showing the mental balance of such interpreter and his capacity to remember the questions that were propounded by the prosecuting attorney through him to the deceased and the deceased's answers thereto, as the admissibility of such purported dying declaration depended on the truthfulness and accuracy of the interpretation of such questions and answers.

2. Great liberality should be allowed by the trial court in the cross-examination of an interpreter touching the extent of his addiction to the use of opium or any other narcotic which is well known to impair the intellectual faculties and reduce the capacity of an individual to remember and correctly relate incidents, as well as to morally pervert him and destroy the sanctions of truthfulness on the part of a witness.

3. The habitual use of opium, morphine, cocaine or other like narcotics, which inevitably tend to impair the mind, destroy the memory and pervert the moral character of a witness, may be shown for the purpose of affecting his credibility or the weight that should be given to his testimony, but is not ground for the exclusion of his testimony unless it satisfactorily appears that he was under its influence to such an extent that his intellect was unbalanced when examined as a witness.

4. Where a witness is offered to testify to the statements of another person spoken in a language not understood by such person but translated for him by an interpreter, such witness is not

On how sense of impending death is evidenced to make dying declarations admissible in evidence, see notes in 56 L. R. A. 406; 30 L. R. A., N. S., 393.

On evidence to establish mental incompetency of witness, see note in 46 L. R. A., N. S., 1031.

qualified to testify, because he does not speak from personal knowledge, and the interpreter, or some other person who heard and understood the language in which the testimony was given, is the only competent witness to such statements.

5. Where a purported dying declaration contains such statements as: "I don't know whether I am going to die or not, but I think I have only one chance out of a hundred that I will live," and "In making this statement I do so in fear that I may die, but I don't know whether I will die or not," and at the request of the prosecuting attorney a final clause is added to the statement as follows: "I now sign this statement and again say that the facts therein are true and that I make the same under the fear and belief that I will die," such final clause not appearing to have been the voluntary statement of the deceased, the declaration is not admissible as a dying declaration, since it does not satisfactorily appear that it was made under a sense of impending death or that the deceased had given up all hope or expectation of recovery, and the admission of such dying declaration by the trial court is reversible error.

[As to incompetency of witness through insanity, intoxication or loss of memory, see note in 35 Am. Rep. 291.]

APPEAL from the District Court of the Third Judicial District for Ada County. Hon. Carl A. Davis, Judge.

Prosecution for murder; conviction of manslaughter. Appealed. Judgment *reversed.*

Perky & Brinck, for Appellant.

When a witness is presented by a party in an action, the question as to that witness' capacity to make accurate observation, to receive accurate impressions and to retain such impressions in his memory, as well as his power and inclination to truthfully relate what has taken place, are all subjects which necessarily affect the credibility of the witness.

And if the witness by reason of the habitual use of a narcotic has brought himself to a condition where his impressions are not to be trusted and his dreams have become indistinguishable to his mind from the realities surrounding him, such fact should be brought to the attention of the jury. (2 Wigmore on Evidence, sec. 934, citing *McDowell v. Pres-*

*ton,* 26 Ga. 528, 535; *People v. Webster,* 139 N. Y. 73, 34 N. E. 730; *State v. Robinson,* 12 Wash. 491, 41 Pac. 884.)

The distinction between showing such habit for the purpose of affecting the witness' credibility and for the purpose of excluding his testimony is apparent. (1 Rice on Evidence, p. 625.)

The right to impeach a witness by cross-examination is universally recognized. (*Paxton v. State,* 114 Ark. 393, 170 S. W. 80.)

It is permissible on cross-examination to interrogate a witness as to matters affecting his credibility. (*State v. Madden,* 170 Iowa, 230, 148 N. W. 995; *Burge v. State,* 73 Tex. Cr. 505, 167 S. W. 63; *Fountain v. Connecticut Fire Ins. Co.* (Cal. App.), 117 Pac. 630; *Hayden v. Commonwealth,* 140 Ky. 634, 131 S. W. 521.)

It must be shown that the declarations of deceased were made under a sense of impending death before admitting them in evidence. (21 Cyc. 1026, note 49; *United States v. Woods,* 4 Cranch C. C. 484, Fed. Cas. No. 16,760; *Brennan v. People,* 37 Colo: 256, 86 Pac. 79; *Fuqua v. Commonwealth,* 24 Ky. Law, 2204, 73 S. W. 782; *Joslin v. State,* 75 Miss. 838, 23 So. 515; *State v. Vaughan,* 152 Mo. 73, 53 S. W. 420; *Lyles v. State,* 48 Tex. Cr. 119, 86 S. W. 763; *State v. Brumo,* 153 Iowa, 7, 132 N. W. 817; *People v. Smith,* 164 Cal. 451, 129 Pac. 785; *People v. Cassesse,* 251 Ill. 422, 96 N. E. 274; *Bilton v. Territory,* 1 Okl. Cr. 566, 99 Pac. 163.)

A dying declaration is only admissible as to the circumstances of the transaction itself which results in the death of the declarant, and any self-serving statements must be excluded. (*Patterson v. Commonwealth,* 114 Va. 807, 75 S. E. 737; Underhill's Cr. Ev., 2d ed., sec. 108.)

J. H. Peterson, Atty. Genl., T. C. Coffin and Herbert Wing, Assts., and R. L. Givens and E. P. Barnes, for Respondent.

Under the facts surrounding the making of the dying declaration and the substance of the same shown by its contents, the statement was properly admitted, and there was no error in admitting the same. (*State v. Roberts,* 28 Nev. 350, 82

Pac. 100; 1 Greenl. Ev., 13th ed., sec. 158; *State v. Boyland,* 24 Kan. 186; *Jones v. State,* 71 Ind. 66; *Dumas v. State,* 62 Ga. 58; *People v. Yokum,* 118 Cal. 437, 50 Pac. 686; *People v. Ramirez,* 73 Cal. 403, 15 Pac. 33; Wharton's Homicide, sec. 621; *People v. Farmer,* 77 Cal. 1, 18 Pac. 800; *State v. Wilmbusse,* 8 Ida. 608, 70 Pac. 849; *State v. Yee Wee,* 7 Ida. 188, 61 Pac. 588; *People v. Bemmerly,* 87 Cal. 117, 25 Pac. 266; *Snell v. State,* 29 Tex. App. 236, 25 Am. St. 723, 15 S. W. 722.)

It clearly appears that the deceased had no hope of recovery, and that the proper foundation was laid for the introduction of the dying declaration. (*People v. Crews,* 102 Cal. 174, 36 Pac. 367; Wigmore's Ev., sec. 1442.)

The fact that it was not in the exact language of the declarant would not render it inadmissible. (*State v. Baldwin,* 15 Wash. 15, 45 Pac. 650.)

Another exception to the rule that self-serving declarations are inadmissible is to be found in the reception of a party's declarations as to his physical or mental condition, when such are in controversy. (Wharton's Criminal Evidence, secs. 272, 693; Underhill on Criminal Evidence, sec. 99.)

. Unless it is shown that the witness is under the influence of the drug at the time such witness is testifying or at the time the events were observed, such testimony is entirely of a collateral nature, and therefore inadmissible. (*Botkin v. Cassady,* 106 Iowa, 334, 76 N. W. 722; *State v. King,* 88 Minn. 175, 92 N. W. 965; *State v. Gleim,* 17 Mont. 17, 52 Am. St. 655, 41 Pac. 998, 31 L. R. A. 294.)

Proof of independent collateral and distinct offenses is admissible only upon the question of intent. (Wharton's Crim. Ev., sec. 475.)

BUDGE, J.—Fong Loon by information filed by the prosecuting attorney of Ada county on August 28, 1913, was charged with the crime of murder, in the killing of one Fong Chung at Boise, on July 21, 1913. He entered a plea of not guilty and the cause was tried before the court and jury, resulting in the jury finding him guilty of manslaughter. He

was sentenced to serve a term of imprisonment in the state penitentiary of not less than five nor more than ten years. A motion was made for a new trial and overruled. This is an appeal from the order of the court denying the motion for new trial and from the judgment.

Forty-three assignments of error are made by appellant. These assignments are directed in the main to alleged errors of law committed by the court in ruling upon the admission and exclusion of evidence and upon the argument of counsel for the state, the giving and refusing of certain instructions, and the insufficiency of the evidence to sustain the verdict. In addition to these assignments of error, appellant makes the general assignment that the court erred in overruling his motion for a new trial, and in making and rendering its judgment upon the verdict.

We have carefully examined the transcript, the briefs of counsel, and the numerous authorities cited by counsel for the state and for appellant. From this examination we have reached the conclusion that it will not be necessary to discuss each and all of the numerous assignments of error relied upon by appellant in this case. But we will confine our discussion largely to the rulings of the court in the admission of evidence, which will include what, to our minds, is the most important question involved in this appeal; that is, the admission of the purported dying declaration of the deceased Fong Chung, being state's exhibit 16.

The shooting took place at 622 Front street, in Boise, Ada county, on the evening of July 21, 1913, some time between 9 and 10 o'clock. Immediately after Fong Chung received the gunshot wound he was conveyed to the St. Luke's hospital, in Boise, and while there two major operations were performed upon him by the physicians called to attend him in an effort to save his life. However, these operations proved ineffectual, and on Friday, July 25, 1913, he died.

The theory of the state is that appellant wilfully, premeditatedly and deliberately killed the deceased by means of a loaded pistol, by discharging the same into his body thereby inflicting the mortal wound. Appellant, on the other hand,

contends that the deceased was himself responsible for his
death by reason of his drawing a pistol with intent to kill
appellant; that the pistol was thrust away and grabbed by
appellant, and caused to be discharged at and into the body of
the deceased by his own act.

It appears from the record that the county prosecuting
attorney and his stenographer visited St. Luke's hospital on
the morning of July 23, 1913, for the purpose of obtaining a
statement or dying declaration from Fong Chung, who was a
Chinaman.   Questions were propounded by the prosecuting
attorney to one Yee Wee, another Chinaman, who in turn,
it is presumed, translated them from the English into the
Chinese language to Fong Chung, and then interpreted the
answers of Fong Chung.   These questions and the purported
answers were taken down in shorthand by the stenographer
who, upon returning to his office, proceeded to reduce them to
narrative form.   On July 24, 1913, he submitted the result
of his transcribing to the prosecuting attorney for approval.
At this time there was added to this transcript, at the sugges-
tion of the prosecuting attorney, the following clause:

"I now sign this statement and again say that the facts
therein are true and that I make the same under the fear and
belief that I will die."

The stenographer on that day, July 24, 1913, in company
with Yee Wee and detective Routson, went back to the hos-
pital, where this narrative statement with the added clause
was read to Yee Wee, who is supposed to have translated it
entirely from the English into the Chinese language to Fong
Chung, and to have received Fong Chung's answers thereto
and to have correctly interpreted those answers.   In short,
Fong Chung is supposed to have adopted the statement pre-
pared and submitted to him through Yee Wee as his dying
declaration containing the true facts without any change or
modification.

Said stenographer, on the witness-stand, testified that Fong
Chung's answers made to Yee Wee were "more of a grunt";
that he did not know what the answers were; and did not re-
call that there was any difference in the grunt of any answer

that he made; that he answered all questions more or less in a grunt, and as far as what it was that he said or what the grunt meant, he did not know.

We think it fair to presume from the record that Yee Wee, the interpreter, was the only supposed disinterested person present on July 23, 1913, when the questions and answers which made up the narrative statement were taken in shorthand, who could understand the English language, translate it into the Chinese language to Fong Chung, and understand Fong Chung's answers to the questions.

The following is the statement purported to have been made by Fong Chung at this time:

"My name is Fong Chung. I don't know how this trouble started. I don't know whether I am going to die or not, but I think I have only one chance out of a hundred that I will live. In making this statement I do so in fear that I may die, but I don't know whether I will die or not. Fong Lin (Loon) is the man that shot me. I don't know why he shot me. We had no quarrel. I never had any trouble with him. He was not drunk when he shot me. He was sober. Fong Gee and Fong Sue were with me when I was shot. There was four of us there at that time. Fong Lin (Loon) did not say anything when he shot me. When he first came in he wanted to knock me down. I told him that I did not want to fight him. Again I say I make this statement in fear that I will die, but I don't know whether I will die or not. The statements I make are true. I did not have either a gun or knife on me at the time I was shot. I don't know what Fong Lin (Loon) wanted to fight me about. I don't know whether Ah Chung was there. I don't know which Chung you mean, but I do not remember any Ah Chung in there at that time. I know that there were two men in there besides the fellow that shot me. I had never threatened the Fong Lin (Loon) that shot me. I now sign this statement and again say that the facts therein are true and that I make the same under the fear and belief that I will die."

Yee Wee, upon cross-examination with reference to the foregoing statement, testified:

"Fong Chung say a good many times that he don't know whether he is going to get well or whether he is going to die, I cannot remember. I have pretty bad memory—I say pretty bad sometimes—pretty good sometimes."

Numerous questions were propounded to Yee Wee upon cross-examination by counsel for appellant for the purpose of testing his competency and credibility, to which objections were made by counsel for the state and sustained by the trial court. Among these questions were the following:

"Isn't it a fact that you are an habitual user of opium?" Counsel for the state interposed an objection to this question, which objection was sustained. The witness was thereupon asked: "You have been using *yen she?*" This question was objected to and excluded. He was thereupon asked: "Prior to going on the stand last Saturday at any time did you use *yen she?*" This question was also objected to and excluded.

This witness was asked upon direct examination where he resided in the city of Boise, to which he made answer that he and his brothers resided in the basement of the Chinese temple. Upon cross-examination he testified that he sold Chinese medicine and Chinese opium to Chinamen; and said further: "I do a little bit something else every once in awhile." Thereupon counsel for appellant propounded to him the following question:

"Was it [meaning the basement of the Chinese Temple] used that day and night [the time of the shooting of Fong Chung] as a gambling place?"

To this question counsel for the state objected and the objection was sustained by the trial court. The question was proper, and the objection should have been overruled.

Counsel for the state did not ask the witness if he was engaged in gambling or conducting a gambling place. It was eminently proper, under the facts of this particular case, to have asked the witness upon cross-examination not only if the basement of the Chinese temple in which he resided was used on the night of the homicide as a gambling place, but what, if any, occupation he was following at the time in connection with such gambling resort, if he answered in the affirmative.

This question was not asked for the purpose of impeachment as provided for under sec. 6082, Rev. Codes, or to establish the commission of a particular wrongful act, but for the express purpose of showing the business, occupation, manner and place of living of the witness; and it is an elementary rule of evidence that such information may be elicited upon cross-examination. (*Hollingsworth v. State,* 53 Ark. 387, 14 S. W. 41; *Wallace v. State,* 41 Fla. 547, 26 So. 713; *State v. Ward,* 49 Conn. 429.)

In the case of *United States v. Wood,* 4 Dak. 455, 33 N. W. 59, which is particularly in point, the court at page 69 of the opinion said: "In 1 Greenl. Ev. (14th ed.) the learned author, while recognizing the fact that the courts are not in perfect harmony upon the subject, uses the following very pertinent language in announcing a proposition of elementary law: 'There is certainly great force in the argument that, where a man's liberty or his life depends upon the testimony of another, it is of infinite importance that those who are to decide upon the testimony should know, to the greatest extent, how far the witness is to be trusted. They cannot look into his breast to see what passes there, but must form their opinion on the collateral indications of his good faith and sincerity. Whatever, therefore, may materially assist them in this inquiry is most essential to the investigation of truth; and it cannot but be material for the jury to understand the character of the witness whom they are called upon to believe, and to know whether, although he has not been convicted of any crime, he has not in some measure rendered himself less credible by his disgraceful conduct. The weight of this argument seems to have been felt by the judge in several cases in which questions tending to disgrace the witness have been permitted in cross-examination. . . . . Nor does there seem to be any good reason why a witness should be privileged from answering a question touching his present situation and employment and associates, if they are of his own choice; as, for example, in what house or family he resides, what is his ordinary occupation, and whether he is intimately acquainted and conversant with certain persons, and the like; for, how-

ever these may disgrace him, his position is one of his own selection.' "

If the witness had been voluntarily engaged in any occupation which would tend to impair his credibility, the jury was entitled to that information. By the great weight of authority it has always been permissible upon cross-examination to inquire into the antecedents of a witness by showing his occupation, social connections, manner and place of living, etc. Being matters largely of his own choice, they indicate his true character. He is therefore responsible for them, and they may be inquired into for the purpose of affecting his credibility. (*State v. Pfefferle*, 36 Kan. 90, 12 Pac. 406; *Musgraves v. State*, 3 Okl. Cr. 421, 106 Pac. 544; *Hendrix v. State*, 4 Okl. Cr. 611, 113 Pac. 244; *Crawford v. Ferguson*, 5 Okl. Cr. 377, 115 Pac. 278, 45 L. R. A., N. S., 519; *Fowler v. State*, 8 Okl. Cr. 130, 126 Pac. 831; *Burdette v. Commonwealth*, 93 Ky. 76, 18 S. W. 1011; *Leslie v. Commonwealth*, 19 Ky. Law, 1201, 42 S. W. 1095.)

While the action of the court in refusing to permit the witness to answer the question last above quoted, standing alone, would not constitute reversible error, yet under the peculiar facts of this case we think the witness should have been permitted to answer. It had theretofore been established that Yee Wee had been convicted of a felony.

In our opinion the court committed reversible error in sustaining the objections to the questions as to the witness' use of opium and *yen she*. It was evidently the purpose of counsel for appellant to show that this witness was an habitual user of these drugs. The court should have permitted counsel for appellant to show by the witness himself his habitual use of opium, *yen she*, or other like narcotics, and to further establish by competent evidence the effect the habitual use of such narcotics would have upon the mental faculties of the witness. This was vitally important to appellant, for the reason that Yee Wee, as heretofore stated, was the only supposed disinterested witness capable of testifying of his own knowledge of the truth of the statements contained in the purported dying declaration.

The question, therefore, of the admissibility of witness Yee Wee's habitual use of opium and *yen she* was squarely presented to the court. Evidence of this fact was competent for the purpose of showing the mental balance of the witness, and his capacity to remember the questions that were propounded by the representative of the state through him to Fong Chung, and Fong Chung's answers thereto. The admissibility of the purported dying declaration, if not subject to other objections, depended on the truthfulness and accuracy of the interpretation of the question and answers to and from Fong Chung. And we think it was error for the court to restrict counsel for appellant's attempt to elicit by cross-examination this information from Yee Wee, or to lay the foundation for the purpose of establishing by independent proof that Yee Wee was an habitual user of opium or other like narcotics, the extent of that use, and what, if any, effect it had or was more than likely to have upon the mental balance of this witness, the truthfulness of his testimony, and his capacity to remember and correctly translate the questions of the representative of the state to Fong Chung into Chinese and Fong Chung's answers into English:

We believe it will be admitted that habitual users of opium, or other like narcotics, become notorious liars. The habit of lying comes doubtless from the fact that the users of those narcotics pass the greater part of their lives in an unreal world, and thus become unable to distinguish between images and facts, between illusions and realities.

In Wharton & Stille's Medical Jurisprudence, 3d ed., sec. 1111, it is said that "Of the mental symptoms," in the case of a morphinomaniac or other habitual users of drugs, "the most characteristic, perhaps, are the moral perversions. The chronic morphinomaniac is often a confirmed liar. The truth is not in him. . . . . There is something quite pathological in this mendacity; the lying is unblushing, inexpert, spontaneous,—a sort of second nature. . . . . They have been so often narcotized, and thus cut off from actualities, living in a dreamstate, that they do not seem able to recognize realities when they see them."

Thus it becomes apparent that great liberality should have been extended to counsel for appellant in the cross-examination of witness Yee Wee, touching his use and the extent of the use of opium or any other like narcotic, well known to distort the intellect, reduce the capacity of an individual to remember and correctly relate incidents, as well as tending to create moral perversion in him. Yee Wee was in a position to have fabricated any state of facts from a feeling of revenge or ill will toward appellant, or as the result of a delusion caused by the action of a drug upon his mental powers. Such a state of mind may have caused him to imagine injuries which appellant might do him if acquitted, or to imagine an obligation due from him to the deceased to bring about the conviction of appellant to satisfy the deceased or his relatives. The capacity of a witness to observe and to receive accurate impressions, to retain them in his memory, and to correctly relate them, also his power and inclination to be truthful, are all subjects which go to the credibility of a witness. And we think it was error for the court to restrict the cross-examination of this witness and prevent the elicitation of the above facts.

The rule announced by Mr. Wigmore in his work on Evidence (2 Wigmore's Evidence, sec. 934, citing *McDowell v. Preston*, 26 Ga. 528, 535; *People v. Webster*, 139 N. Y. 73, 34 N. E. 730) is as follows:

"Any diseased impairment of the testimonial powers, arising from whatever source, ought also to be considered:

"1879, Beck, C. J., in *Alleman v. Stepp*, 52 Iowa, 626, 627, 35 Am. Rep. 288, 3 N. W. 636: 'Mental defects in the witness, or loss or impairment of memory, will according to the observation of all men detract from the credibility otherwise due a witness, just as surely as do moral defects. It is not reasonable to hold that the law will permit impeachment of a witness by showing the moral defects of his character, and will not permit impeachment by proof of defects of memory caused by diseases of the body or mind. . . . . It is proper to say that the rule we recognize extends no farther than to permit the impeachment of a witness by showing an abnormal

condition of the mind caused by disease or habits which impair the memory. . . . . The law can devise no standard of measurement or test of mind in its normal condition.'

"Accordingly, the morphine habit, so far as it may have had such an effect, should be received."

We do not mean to hold in this case that the fact that a witness is an habitual user of opium or morphine excludes his testimony unless it is shown that he is mentally irresponsible as a result of the use of such drug when examined as a witness. But we do mean to hold that the habitual use of morphine, cocaine and other like narcotics, which inevitably tend to impair the mind, destroy the memory and moral character of a witness, may be shown for the purpose of affecting his credibility or the weight that should be given to his testimony. The distinction between showing such habit for the purpose of affecting the witness' credibility, and of excluding his testimony is stated in 1 Rice on Evidence, p. 625, as follows: "Excessive use of opium may be always shown as tending to impair the credibility of a witness, but it is not ground for the exclusion of his testimony until it satisfactorily appears that he was under its influence when examined or when he states a certain fact to have occurred and attempts a narration of the occurrence."

A number of witnesses were permitted to testify as to what Fong Chung is supposed to have said to Yee Wee when the purported dying declaration was being made. The testimony of these witnesses was objected to upon the ground that it was hearsay; or, in other words, that they should not be permitted to testify on this point, for the reason that they did not testify from personal knowledge of what Fong Chung said. From the facts it is apparent that all they could have known of what Fong Chung said was from the interpretation thereof given by Yee Wee.

This particular point was, we think, decided in the case of *State v. Terline*, 23 R. I. 530, at p. 539, 91 Am. St. 650, 51 Atl. 204, where the court said: "While it is true that the interpretation of the words of a witness testifying in a foreign language by one who is sworn in court and translates the tes-

timony to the tribunal is not obnoxious to the hearsay rule, because both the original witness and the interpreter are under oath and subject to cross-examination, yet where a witness is offered to testify to the statements of another person spoken in a language not understood by him but translated for him by an interpreter, such witness is not qualified, because he does not speak from personal knowledge.'' (Citing 1 Greenl. Ev., 16th ed., sec. 162.) To the same effect is the case of *People v. Ah Yute,* 56 Cal. 119, wherein the court held that ''The testimony of the reporter, based upon his notes, is incompetent to prove the testimony of a witness given in a foreign language, at a former trial, and taken down by the reporter from the interpreter. The interpreter, or some other person, who heard and understood the language in which the testimony was given, should have been called.'' (See, also, *People v. Lee Fat,* 54 Cal. 527, 530.)

There is a distinction between the testimony of an interpreter given directly in a judicial investigation and that given by a witness who assumes to recite what the interpreter said was the statements or evidence of the person for whom the interpretation was being made. In Wharton on Evidence, vol. 1, sec. 174, the language is as follows:

''Mr. Bentham has observed that to constitute hearsay testimony, it must be separated by the interposition of some appreciable time from its reception from the party from whom it is obtained. A, a witness in court, for instance, speaks in so low a tone that what he says has to be repeated to the judge; or a foreigner, when examined, has to be interpreted by an interpreter. In this case the transmission of the witness' evidence is instantaneous, though through the medium of another person, and it is sometimes argued that because such evidence is instantaneous it is not hearsay. But a sounder reason for the distinction is, that in case of repetition or interpretation, the inaudible or foreign witness is examined in court, and is therefore responsible; whereas the extra-judicial witness, whose utterances are reported by another, is not examined in court, and is therefore not responsible.''

From an investigation of the record it is very apparent that the last clause of the purported dying declaration, namely, "I now sign this statement and again say that the facts therein are true and that I make the same under the fear and belief that I will die," was made up, not from any answers received from, or statements made by, Fong Chung, but at the request and under the direction of the county attorney to his stenographer. The latter testified: "I added that clause to this statement because I was instructed to do so by the county attorney. That is the main reason." While it is true that the deceased signed the statement after that clause was inserted, and there was no intention on the part of the county attorney to inject into the statement facts which he understood were not testified to by the deceased, yet, it is quite clear that this statement under no circumstances should have been admitted for the reason that it was not the voluntary statement of the deceased. Therefore the motion of counsel for appellant to strike this latter clause from the declaration should have been allowed. (*Brom v. People,* 216 Ill. 148, 74 N. E. 790.)

From an examination of the purported dying declaration it will be observed that it contains the following statements: "I don't know whether I am going to die or not, but I think I have only one chance out of a hundred that I will live." "In making this statement, I do so in fear that I may die, but I don't know whether I will die or not." "Again I say, I make this statement in fear that I will die, but I don't know whether I will die or not." In the case of *People v. Hodgdon,* 55 Cal. 72, 36 Am. Rep. 30, the facts of which case were somewhat similar to those contained in the case at bar, wherein the question of the admissibility of a dying declaration is discussed, the court said: "It is essential to the admissibility of a dying declaration that it appear that it was made under a sense of impending death; and where it appears that the deceased had any expectation or hope of recovery, however slight it may have been, and though death actually ensued within an hour afterwards, the declaration is not admissible." In the case before us we are of the opinion that it not only

appears upon the face of the purported dying declaration itself, but also from statements made to the interpreter Yee Wee, that the deceased had not abandoned all hope of recovery.

This species of testimony should always be received with the greatest caution. Too much care cannot be observed by the court in scrutinizing the primary facts upon which its admissibility is grounded. No person is entirely exempt from a disposition to excuse and justify his own conduct, or to inflict vengeance upon one at whose hands he has suffered a grievous wrong. Wigmore on Evidence, vol. 2, sec. 1440, in treating of the admissibility of such declarations, says: ''The tests have been variously phrased; there must be 'no hope of recovery'; 'a settled expectation of death'; 'an undoubting belief.' Their general effect is the same. The essential idea is that the belief should be a positive and absolute one, not limited by doubts or reserves; so that no room is left for the operation of worldly motives.'' (*Peak v. State,* 50 N. J. L. 179, 181, at 222, 12 Atl. 701.)

The original rule admitting dying declarations as evidence has been enlarged by judicial construction, but the rule that statements are not admissible as dying declarations when the declarant expresses a hope or belief that he may recover, or indicated by some words that he had not surrendered all hope of recovery as the statements which are offered as a dying declaration were made, has never been modified or departed from. (*People v. Commonwealth,* 87 Ky. 487, 9 S. W. 509, 810; *Biggs v. Commonwealth,* 150 Ky. 675, 150 S. W. 803.)

It is apparent from the repetition made by the deceased that he did not know whether he was going to die or not, but thought that he had one chance out of a hundred to live, that he had not in fact abandoned all hope of recovery.

The admission of this dying declaration was of the utmost concern to the defendant in this case. There was a square conflict in the testimony between defendant and the eye-witnesses as to how the shooting occurred—defendant stating that the gun, while in possession of the deceased, was discharged during the struggle for its possession, while the other witnesses testify that the defendant while standing up shot

the deceased, who was sitting down a few feet away. The proof of the physical facts, namely, the course and direction of the bullet after it entered the body of the deceased, would tend to support the testimony of the defendant.

For the reasons herein set forth, as well as others which we will not discuss in view of the fact that this case must be remanded for a new trial, we are of the opinion that the trial court committed reversible error in admitting in evidence the purported dying declaration, state's exhibit 16. No proper foundation had been laid to warrant the admission of this declaration. It was not made under the apprehension of impending death. It was not made without hope of recovery, or at a time when the declarant had abandoned all hope of recovery, but upon its face shows that the declarant still entertained some hope of recovery.

It is therefore ordered that the judgment of the trial court be vacated; that the order denying appellant's motion for a new trial be set aside; and that the cause be remanded, with instructions that a new trial be granted to appellant.

Sullivan, C. J., concurs.

MORGAN, J., Concurring Specially.—I concur in the conclusion reached by the majority of the court, but not to the extent of agreeing that the trial court erred in sustaining the objection of counsel for the state to the question propounded to the witness Yee Wee, upon cross-examination, whereby it was sought to elicit from him that his place of residence had been used as a gambling place. It is clear this question was propounded for the purpose of impeaching and discrediting the witness, and that form of impeachment is prohibited by secs. 6082 and 6091, Rev. Codes, which are as follows:

"Sec. 6082. A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth, honesty, or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony." (*State v. Anthony*, 6 Ida. 383, 55 Pac. 884; *State v. Hammock*, 18 Ida. 424, 110 Pac. 169.)

"Sec. 6091. A witness must answer questions legal and pertinent to the matter in issue, though his answer may establish a claim against himself; but he need not give an answer which will have a tendency to subject him to punishment for a felony; nor need he give an answer which will have a direct tendency to degrade his character, unless it be the very fact in issue, or to a fact from which the fact in issue would be presumed. But a witness must answer as to the fact of his previous conviction for felony."

Since the foregoing sections of our code are exact copies of secs. 2051 and 2065, California Code of Civil Procedure, the following California cases, selected from a large number of the opinions of the supreme court of that state, construing those sections should be of persuasive influence in construing ours: *Sharon v. Sharon,* 79 Cal. 633, 22 Pac. 26 (at 38), 131; *Jones v. Duchow,* 87 Cal. 109, 23 Pac. 371, 25 Pac. 256; *People v. Tiley,* 84 Cal. 651, 24 Pac. 290; *Clements v. McGinn,* 4 Cal. Unrep. 163, 33 Pac. 920; *People v. Baird,* 104 Cal. 462, 38 Pac. 310; *People v. Un Dong,* 106 Cal. 83, 39 Pac. 12. See, also, *United States v. Harris,* 12 Blatchf. 434, 26 Fed. Cas. No. 15,314; *State v. Carson,* 66 Me. 116; *Gifford v. People,* 87 Ill. 210; *Hayward v. People,* 96 Ill. 492; *Caples v. State,* 3 Okl. Cr. 72, 104 Pac. 493, 26 L. R. A., N. S., 1033; *Commonwealth v. Welch,* 111 Ky. 530, 63 S. W. 984; *State v. Howard,* 120 La. 311, 45 So. 260; *Commonwealth v. Schaffner,* 146 Mass. 512, 16 N. E. 280; *Commonwealth v. Brady,* 147 Mass. 583, 18 N. E. 568.