THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BERNARD POLK *et al.*, Defendants-Appellants.

First District (5th Division)   No. 84—0004

Opinion filed May 9, 1986.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Donald L. Bertell, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Patrick J. Foley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:
Following a jury trial defendants Bernard Polk and Albert Cox were convicted of murder and aggravated kidnaping. Both defendants received concurrent prison terms of 25 years for murder and 20 years for aggravated kidnaping. On appeal defendants contend: (1) a pretrial identification of the defendants was conducted under such suggestive circumstances as to render that identification and subsequent

in-court identifications unreliable; (2) it was reversible error for the trial court to refuse to accept a defense instruction concerning the credibility of drug addicts; (3) the failure of defendants' trial counsel to move to quash defendants' arrests denied them due process of law and constituted ineffective assistance of counsel.

We affirm.

At trial the following pertinent evidence was introduced. Victoria Green testified that on July 18, 1982, she was living in a third-floor apartment at 914 St. Charles, Maywood, with her brother, Peter Green, and Guy McCoats, the victim. At about noon a tan car pulled up and two men emerged. At the time Victoria did not know who they were, although she had seen Cox once at a store. In court she identified them as the defendants. Both men came upstairs to her apartment door with defendant Cox holding an 18- to 24-inch pipe. As Victoria stood outside her door Guy McCoats approached and asked the defendants if they wanted to see him. They said yes and all three men entered the apartment, leaving Victoria outside. Victoria then heard a gunshot from inside the apartment where she telephoned the police. From that apartment she saw the defendants getting into their car with McCoats. Before they drove away she heard defendant Cox say that McCoats would not be seen alive again if anybody reported this.

The police arrived 45 to 60 minutes later (Victoria had told them to come over without reporting what had happened). As Victoria was telling them what she had seen defendant Cox returned to the scene. Victoria pointed him out to the police, who arrested him. Trial testimony from other witnesses established that Cox was released later that afternoon because the police did not initially find any witnesses to corroborate Victoria's account. At about 3 p.m. Victoria again spoke to the police and drove through the neighborhood with them in search of McCoats, accompanied by Peter Green.

McCoats' body was found in a forest preserve at about 4 p.m. He had been shot three times in the head and once in the chest. The defendants were arrested some time after 6 p.m. Victoria testified that later that evening she viewed a lineup and identified both defendants as the men she had seen abduct McCoats. However, two officers who were present at the lineup testified she only identified Cox.

Peter Green testified that he was sleeping on a couch inside their studio apartment when a slamming door awakened him. He saw McCoats and two other men, identified by him in court as the defendants. Defendant Cox was holding an 18-inch pipe. The defendants began arguing with McCoats, with Cox asking McCoats, "where is my dope at." McCoats said he did not have it. Cox then struck McCoats

about the head and shoulders with the pipe. The man began fighting and defendant Polk pulled out a gun and shot toward the ceiling. Defendants grabbed McCoats in a headlock and moved toward the door. Polk asked Peter if he had eight dollars. When Peter said he did not, Polk told him he should get the money if he wanted to see McCoats alive.

According to Peter the defendants then dragged McCoats downstairs and put him in a light brown car. Polk yelled out that McCoats would be freed for eight dollars, also threatening that McCoats would not be seen again if anybody told what had happened. They then drove off with McCoats.

Peter admitted that when the police arrived at 1:15 or 1:30 p.m. he did not tell them what he had seen. He did tell the police at 3:30 what had happened, and when he viewed the lineup that evening he identified the two defendants.

Brenda Williams, who lived in the same building as the Greens, testified that between 12 and 12:30 p.m. on the occurrence date she saw Guy McCoats going up to the third floor with two men. One of those men had a 15- to 18-inch pipe in his hand. She also noticed a brown and beige Buick in the parking lot. After walking to a nearby store and buying some wine she went to a park. She then saw the same car, containing McCoats and the two men, drive toward the forest preserve.

Cheryl Davis testified that in the early evening the day before the occurrence she bought a "one-and-one" (a street drug composed of Talwin and Pyribenzamine, also known as T's and Blues) from defendant Polk for eight dollars in a second-floor apartment at 15th and Railroad in Maywood. She could hear the voice of defendant Cox in another room of the apartment. Guy McCoats then entered and obtained the same drug from Polk. However, McCoats did not have the eight dollars. When Polk told him he had better give him the money McCoats ran down the stairs, saying he would pay that night or the next day. Polk followed him down, saying, "You will see I don't take that s---. You are going to give me my eight dollars. You'll see."

Davis returned to the same apartment that evening. Defendant Polk was there alone, armed with a gun. He told her to tell McCoats if he did not pay he would come over there at noon and kill him. Later that evening Davis told McCoats this.

Davis further testified that at noon the next day, while standing on a third-floor balcony at 914 St. Charles, she saw the defendants exiting a yellowish-tan Buick that she recognized as belonging to Cox. Cox was carrying an 18- to 24-inch pipe. When Davis saw them going

to the Greens' apartment she ran to the outside of that door. She heard McCoats screaming and pleading with the defendants and then heard a shot. The defendants brought McCoats out and put him in their car. McCoats unsuccessfully asked people on the scene for eight dollars. When a bystander produced less than that it was refused. Cox stated that without eight dollars McCoats would not be seen again. Polk stated that a call to the police would also mean McCoats would not be seen again.

On cross-examination Davis admitted that the day of her testimony was the first time she had told any official what had happened. She explained that she had been afraid of the defendants. Davis, who had previously been convicted for misdemeanor theft, admitted that she was, at the time of trial, in the custody of Du Page County on pending theft charges. She denied that the prosecutors had promised to inform the Du Page prosecutors of her cooperation. However, it was stipulated at trial that if called to testify, Assistant State's Attorney William Walters would state that prior to her testimony Davis was told that the Du Page prosecutors would be informed that she had testified for the prosecution in a murder trial.

Davis also admitted that she had formerly used narcotics (T's and Blues) for two or three years, but denied being an addict, stating that during that period she "got high maybe twice a week." She took that drug orally, not by injection. She denied using heroin, but stated that she had used cocaine and had injected that drug four or five times. She stated that a line-shaped scar on the back of her left hand was the result of these cocaine injections. She also admitted that she occasionally stole to get money for cocaine.

Davis denied having used any narcotics on the day she witnessed the abduction. She admitted to having taken T's and Blues on the two occasions she saw defendant Polk the evening before (actually by her testimony the second occasion was at 1:30 or 2 a.m. on the morning of the abduction). However, she also testified that the effects of this drug lasted for only an hour.

Maywood police officer Charles Gunn confirmed that when he first spoke to Victoria and Peter Green at about 1:20 p.m. at the apartment building Victoria told him what she had seen, but Peter told him he knew nothing about it. At that time Brenda Williams and Cheryl Davis also denied any knowledge of the incident with Davis saying she did not wish to get involved. However, the second time Gunn spoke to Peter, at about 3 p.m., he did receive information about the incident.

Officer Gunn also testified that defendant Cox' car was located at

about 2:30 a.m. the day after the incident. No blood was found in the car. However, it was established at trial that a box of .38 Special bullets was recovered from the trunk of the car. It was stipulated that if called to testify a forensic scientist who examined the four bullets recovered from the victim would testify that they were the same caliber as those recovered from the car.

Defendant Cox took the stand and denied knowing the victim, Cheryl Davis, Vicky Green, or Peter Green. At the time of the occurrence he lived at 6 South 15th Avenue in Maywood (located five minutes by car from the victim's apartment). He testified that from 5 p.m. the day before the occurrence he was at the apartment of a friend on the west side of Chicago. He returned to his apartment at 10 a.m. the next day, leaving at noon to go to the apartment of a neighbor, Dorothy Harris, to use the phone. He remained on the phone for half an hour, spoke to Harris for five to 10 minutes, went to the grocery store and brought back items for her, and then drove to a friend's house where he was initially arrested. At that time he told the police his alibi. Cox admitted to having been convicted of a burglary in 1977. On cross-examination he identified his car from a photograph previously identified by State witnesses as the one they saw at the time of the occurrence outside the victim's building.

Dorothy Harris also testified that Cox came to her apartment about noon on the day of the occurrence. He stayed on the phone 30 to 45 minutes, went to the grocery store for her and returned in 15 to 20 minutes, talked to her for 10 minutes and then left. Harris also testified that the victim's building was five blocks away. It was stipulated that if called to testify Assistant State's Attorney Walters would have testified that Harris had told him Cox was at her apartment from 11:45 a.m. to 12:15 p.m. and she next saw him in a squad car at 1 p.m.

We first consider defendants' contentions concerning an allegedly suggestive lineup viewed by Victoria and Peter Green. Testimony adduced at the hearing on defendants' motion to suppress identification testimony and at trial established that on the evening of the occurrence Victoria and Peter separately viewed the same eight-man lineup. Aside from the defendants three of the men in the lineup were known to Victoria and Peter as being from their building. According to Officer Gunn's lineup report the three other men who were not known to defendants were 6 feet 2 inches, 5 feet 10 inches, and 6 feet 2 inches, weighing, respectively, 235, 185, and 215 pounds. Defendants Polk and Cox were, respectively, 5 feet 9 inches, 185 pounds, and 5 feet 11 inches, 185 pounds. Defendants cite to arrest cards indica-

ting that defendant Polk was 5 feet 7 inches or 5 feet 8 inches and 175 pounds and defendant Cox was 5 feet 10 inches, 175 pounds. However that information was apparently not presented in the pretrial or trial proceedings below, unlike the evidence we have cited. The evidence does establish that the Greens had described the defendants as 5 feet 9 inches and 5 feet 11 inches. Defendants also flatly assert that two of the individuals not known to the Greens were 6 feet 5 inches. However, this assertion is based on equivocal responses by the Greens to leading questions concerning their opinion of the height of these two men. The testimony of Officer Gunn as well as that of Investigator Edward Adams, who was also present at the lineup, establishes that the two tallest men were 6 feet 2 inches.

When the three men known to the Greens are eliminated it is then apparent that the Greens in effect viewed a five-man lineup consisting of men ranging in height from 5 feet 9 inches to 6 feet 2 inches and in weight from 185 to 235 pounds. As to these men defendants object only to the alleged height discrepancies. Defendants have not included the lineup photograph in the record on appeal, although it was considered by the trial court. Nor have defendants asserted that any other distinctive physical characteristics or clothing differences marred this lineup.

■■ A reviewing court must look at the totality of the circumstances surrounding a pretrial identification in determining whether it was unnecessarily suggestive. (*People v. Hamilton* (1977), 54 Ill. App. 3d 215, 369 N.E.2d 377.) Certainly the mere fact that the effective numerical composition of the lineup was reduced from eight to five did not render the lineup defective. (*People v. Kinzie* (1975), 31 Ill. App. 3d 832, 334 N.E.2d 872, defendant in lineup with only one other man; *People v. Kirk* (1979), 76 Ill. App. 3d 459, 394 N.E.2d 1212, *cert. denied* (1980), 447 U.S. 925, 65 L. Ed. 2d 118, 100 S. Ct. 3019, witness recognized three or four of the men standing with the defendant in a six-man lineup.) Nor do we find that the differences in height were such as to render the identification procedures unnecessarily suggestive. The police are not required to place physically identical men in a lineup and minor differences in size are not deemed to create improperly suggestive conditions. (*People v. Prignano* (1971), 2 Ill. App. 3d 163, 278 N.E.2d 128, *cert. denied* (1972), 409 U.S. 851, 34 L. Ed. 2d 94, 93 S. Ct. 62; *People v. Keane* (1970), 127 Ill. App. 2d 383, 262 N.E.2d 364.) Moreover in this cause both witnesses testified that they picked out the defendants because of their faces. Under these circumstances we find that the trial court did not err in denying defendants' motion to suppress their identification testimony.

■ Defendants next contend that the trial court erred in refusing to tender to the jury the following non-IPI instruction:

"You may consider evidence that a witness was addicted to drugs at the time of the crime in judging that witness' credibility."

The determination of whether to give a non-IPI instruction rests within the sound discretion of the trial judge. (*People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329.) In this instance we find that the trial court properly exercised its discretion in refusing the instruction. Contrary to defendants' contention on appeal the evidence at trial did not establish that Cheryl Davis was ever a narcotics addict. She admitted having previously taken T's and Blues, but stated that she had taken the drug orally, using it to become high twice a week, and she specifically denied having been a drug addict. Under these circumstances the court was clearly correct in refusing an instruction which suggested that the witness had been proved to be an addict. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029; *People v. Thorns* (1978), 62 Ill. App. 3d 1028, 379 N.E.2d 641; *People v. Smith* (1979), 70 Ill. App. 3d 250, 387 N.E.2d 901.) Furthermore, the trial court noted that the evidence of Davis' drug use would be a proper subject of comment to the jury in final argument. This factor was drawn to the jury's attention in final argument and of course had already been brought out through extensive cross-examination.

■ In supplementary *pro se* briefs submitted to this court defendants have also contended that the failure of their trial counsel to move to quash their arrests denied them due process of law and constituted ineffective assistance of counsel. The record suggests that trial counsel withdrew a motion to quash the arrests after the State agreed not to use any of the evidence which would have been suppressed had the motion been successful. But in any event because defendants support their contentions with matters that are dehors the record before us and because their appellate counsel has advised us that this same issue is to be argued in post-conviction proceedings below, we find no basis for properly considering the issue in this appeal.

The judgment of the trial court is affirmed.

Affirmed.

MEJDA, P.J.,* concurs.

---

*This opinion was concurred in prior to Presiding Justice James J. Mejda's retirement from the court.

JUSTICE PINCHAM, dissenting:

I dissent. Cheryl Davis was an extremely important and essential prosecution witness in this aggravated kidnaping and murder trial. Her presence at the various scenes of the criminal episodes enabled her to convincingly and successfully put the pieces of the crime puzzle together for the jury and to identify the defendant as one of the perpetrators. Cheryl Davis had used narcotic drugs over a period of three years prior to trial and was using drugs at the very time she allegedly witnessed the occurrences about which she testified. It was reversible error, therefore, for the trial court to refuse defendants' jury instruction that in judging a witness' credibility, the jury may consider a witness' drug use at the time of the incident about which the witness testified.

The first episode Cheryl Davis testified about was that on her birthday, July 17, 1982, in the early morning hours, she was in the second-floor apartment at 15th and Railroad, where she talked to the defendant, Bernard Polk, and heard the voice of the defendant, Albert Cox. Pursuant to her request, Polk gave Davis drugs, "one-and-one"—T's and Blues (Talwin and Pyribenzamine)—for which Davis paid Polk $8. Ray McCoats, the deceased, entered the apartment and requested from Polk an identical drug order, which Polk filled. McCoats did not have $8 for the drugs and told Polk that he would pay him that night or the following morning. Cheryl Davis went downstairs and got in the car in which she rode with Charlotte McGee and the driver to the apartment building. McCoats ran down the stairs to the car, which stopped. McCoats entered the car. Polk ran down the stairs to the car and said to McCoats, "Are you going to give me my $8? You will see I don't take that s--t. You are going to give me by $8. You'll see." Thus, Cheryl Davis witnessed the motive for McCoats' subsequent kidnaping by Polk.

The second episode about which Cheryl Davis testified was as follows. Davis said she returned with Charlotte McGee to 15th and Railroad later that evening and reentered the second-floor apartment. Polk had a gun which he pulled out and said to Davis, "That m-- f-- that was with you, you tell him that he don't do me like that. If he don't give me my money, I am going to kill him." Polk asked Davis if McCoats was with her when they came earlier. When Davis told Polk that McCoats was not with her, Polk told her, "You better be glad because I was going to do something to you, too. ***. You tell Ray [McCoats] that if he don't give me my money, that I am going to be over there at 12:00 and I'm going to kill him because he don't pull that s--t with me." Davis then left. Polk's conversation expressed to Davis his

motive for killing McCoats. Polk also displayed a gun to Davis, told Davis the place where he would commit the offenses and told her the time he would commit them.

The third episode about which Cheryl Davis testified was that when she left 15th and Railroad, she went to an apartment building at 914 St. Charles Road, where she later told Ray McCoats what Polk had said. Thus, Cheryl Davis communicated to McCoats the motive for his murder as well as the identity of his murderer.

The fourth episode about which Cheryl Davis testified was that at about noon on the following day, July 18, 1982, while Davis was standing on the third-floor balcony at 914 St. Charles Road, at the very hour and place previously designated by Polk, she saw Polk and Cox get out of a parked yellowish-tan Buick car, which Davis knew was owned by Cox. Cox had a pipe which was 18 to 24 inches long and an inch and one-half wide in his hand. Polk and Cox entered the third-floor rear apartment, where McCoats and Vicky Green lived. Davis ran and stood beside McCoats' apartment door. Davis heard Mc-Coats scream, "Please, no, don't, don't do me like this." Davis then heard a gunshot in McCoats' apartment. A few minutes later Polk and Cox brought McCoats out of the apartment and approached their car. McCoats was bloody and beaten. As they approached the car, Davis heard McCoats ask, "Does anybody have $8?" No one had $8 to give McCoats. He then asked Charlotte McGee (the same person who was with Davis at Polk's house the day before) if she had $8. McGee had only $6, but Polk and Cox "wouldn't take that." Cheryl Davis then heard Cox say, "If he doesn't have $8, ain't nobody ever going to see him again." McCoats said, "Please, don't anybody have $8?" Polk and Cox put McCoats in their car. Polk said, "If anybody calls the police, you won't see him again." They drove off and that was the last time Davis saw McCoats.

On October 21, 1983, Davis was brought to the Cook County State's Attorney's office from the Du Page County jail, where she was lodged pending trial on a felony theft indictment and a bail-jumping indictment. It was at this time in the State's Attorney's office that Davis first revealed to the police and the assistant State's Attorney what she said she witnessed on July 17 and 18 of the preceding year. Davis was then called as a State's witness.

On cross-examination Cheryl Davis testified that she never told the police, any law enforcement officer or assistant State's Attorney any of the foregoing episodes because she was afraid, even though she knew that Polk and Cox had been in jail since their arrest in July 1982.

Davis testified that she was not a narcotics addict, but that she had been using narcotics for about two or three years. She did not use heroin. She used T's and Blues, a heroin substitute. She had used cocaine four or five times by injection, which is a more pure form of ingesting cocaine than "snorting" it. Davis said that injection gives "more of a high." She had marks and lines on her hand from injecting cocaine. She obtained some of her money to purchase drugs by stealing clothes and selling them. Davis got high on drugs "maybe twice a week." She got high on the T's and Blues she obtained on July 17, 1982, and later returned for more.

Charles Gunn, an 18-year Maywood police officer, testified that he interviewed Cheryl Davis at the 914 St. Charles Road apartment building at about 1:30 p.m. on July 18, 1982, that Davis told him that she did not know anything and that when he thereafter saw Davis from time to time in Maywood, Davis never told him that she knew anything about the kidnaping and murder.

The evidence established that McCoats' bullet-riddled body was discovered at about 4 p.m. on July 18, 1982, in a forest preserve. Polk and Cox were arrested later that night. Cox denied any involvement in the offenses and told the officers where and with whom he was at the time the offenses were committed. At trial, Cox denied committing the offenses and presented an alibi, which his witness, Dorothy Harris, corroborated.

An issue for the jury to determine was the credibility of the witnesses. Defense counsel requested the court to instruct the jury:

> "You may consider evidence that a witness was addicted to drugs at the time of the crime in judging that witness' credibility."

Defense counsel stated to the court in support of his request for giving the instruction, "[T]he record is complete with people who have admitted to drugs or ingesting drugs during the time of this occurrence and, therefore, there should be some mention about their credibility." The assistant State's Attorney objected to the giving of the instruction, but he failed to assign a basis or grounds for his objection. After stating that it had read the committee notes to Illinois Pattern Jury Instruction, Criminal, No. 1.02 (2d ed. 1981), *People v. Phillips* and *People v. Collins*[1], the court then stated, "[T]here will be arguments to the fact, since there was evidence through testimony in the

---

[1]It seems that the trial judge was referring to *People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469, and either *People v. Collins* (1977), 51 Ill. App. 3d 993, 367 N.E.2d 504, or *People v. Collins* (1977), 48 Ill. App. 3d 643, 362 N.E.2d 1118.

trial that one of them had been taking drugs, one of the witnesses who testified, in their arguments they may argue this." The court did not otherwise state its reason for refusing the requested instruction.

IPI Criminal 2d No. 1.02 informs the jury that, "[y]ou are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness you may take into account his ability and opportunity to observe, [his age], his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case." The committee note to this instruction states, "While this instruction contains most of the usual elements of believability, the Committee recognizes that the evidence in a particular case could call for the insertion of additional elements. For example, in a case involving eyewitness identification, the trial judge may add factors such as the witness' degree of attention at the time of the offense ***. [Citations.] See also *People v. Franz* (1977), 54 Ill. App. 3d 550, 555, 368 N.E.2d 1091, 1095, where the court held: 'An instruction informing the jury that it could consider the evidence that a witness was addicted to drugs at the time of the crime in judging that witness' credibility would have been proper.' " IPI Criminal 2d No. 1.02, Committee Note, at 6.

The identification of the defendants in the case at bar was a crucial and decisive issue. The defendants contend before this court that the identifications of them by Victoria Green and Pete Green as McCoats' assailants were tarnished by the unfavorable circumstances at the crime scene where they viewed the assailants. Unlike the witness Cheryl Davis, neither Victoria Green nor Pete Green knew either defendant. The lineup in which they identified the defendants was unusual. Three of the men in the lineup were personal acquaintances and neighbors of Victoria and Pete Green and lived in the same apartment building. This, certainly at least to some degree, adversely affected the credibility of their lineup identifications.

Conversely, Cheryl Davis' identification of the defendants, according to her testimony, was predicated on her prior knowledge of and personal acquaintance with the defendants. Her testimony furnished the motive for the offenses and the possible means via which the offenses were committed, which also established the defendants as the offenders. Cheryl Davis' credibility was crucial to the State's case.

The majority holds that the trial court properly refused the tendered defense instruction that the jury may consider a witness' narcotics addiction in judging that witness' credibility because "the evidence at trial did not establish that Cheryl Davis was even a narcotics

addict. *** [S]he specifically denied having been a drug addict. Under these circumstances the court was clearly correct in refusing an instruction which suggested that the witness had been proved to be an addict."

As before stated, the State did not express its basis for objecting to the instruction and the trial court did not state its grounds for refusing it. Before this court, however, the State does not urge that the instruction was properly refused because the evidence did not establish that Cheryl Davis was a drug addict. To the contrary, the State admits that Cheryl Davis was a narcotics addict. The State's brief states, "[I]t was brought out by the witness that she was a drug addict ***. The fact that Ms. Davis was a narcotics addict was openly admitted to the jury during both direct and cross-examination of the witness." The trial court's refusal to give the requested narcotics addict instruction therefore cannot be justified on the ground that the evidence did not establish that Cheryl Davis was addicted to drugs or on the ground that she denied being a drug addict. Even if the evidence did not establish that Cheryl Davis was a narcotics addict, her testimony about her drug use warranted the trial court in giving an instruction that the jury may consider the repeated and prolonged use of drugs before and at the time of the crime in determining a witness' credibility.

The trial court's refusal to give the instruction cannot be properly upheld on the ground that Davis' drug use "had already been brought out through extensive cross-examination." Nor can refusal to give the instruction be upheld because the trial judge permitted defense counsel to comment on Davis' drug use to the jury in closing argument. The defendants had the right, through cross-examination, to bring Davis' drug use to the jury's attention. They likewise had the right to comment on her drug use in their argument to the jury. The trial court did not confer any special privilege on the defendants in allowing them to do so. Defendants had the right to have the jury instructed, as a matter of law, that the jury may consider Davis' drug use in judging her credibility. Defense counsel's jury argument was not an adequate substitute for an admonition to the jury in an instruction from the court.

Over 30 years ago, our supreme court was first presented the question of whether a witness' narcotics addiction was appropriate for the jury to consider in determining the witness' credibility. In *People v. Crump* (1955), 5 Ill. 2d 251, 125 N.E.2d 615, Crump was convicted by a jury of a robbery and murder. At trial, an accomplice's testimony for the State implicated Crump in committing the robbery and mur-

der. The supreme court pointed out that the accomplice's testimony "was therefore of great importance. *** If his testimony was fully believed by the jury, it would have had a substantial bearing on the jury's findings ***." 5 Ill. 2d 251, 255-56, 125 N.E.2d 615.

As a ground for reversal, Crump assigned as error the trial court's sustainment of objections to questions to the accomplice on cross-examination as to whether he was a narcotics addict or user. The supreme court stated, "The error assigned presents a clear-cut question of first impression in this State as to whether or not an accomplice witness can be property cross-examined as to the witness's drug addiction for the purpose of impeaching the witness's credibility." *People v. Crump* (1955), 5 Ill. 2d 251, 256, 125 N.E.2d 615.

The State conceded before the supreme court in *Crump* that the questions about the accomplice's drug addiction were proper, but urged that the trial court's exclusion of the testimony was harmless because the jury was properly instructed by the court as to the weight to be given an accomplice's testimony and because the State's evidence, without the testimony of the accomplice, conclusively established Crump's guilt. After reviewing authorities from various jurisdictions, the supreme court held:

> "In *State v. Fong Loon*, 29 Idaho, 248, 158 Pac. 233, it is stated '*Habitual users of opium or other like narcotics become notorious liars. The chronic morphinomaniac is often a confirmed liar—the truth is not in him.* The capacity of a witness to observe and to receive accurate impressions, to retain them in his memory, and to correctly relate them, also his power and inclination to be truthful, are all subjects which to go the credibility of a witness.'
>
> In our opinion, *the jury was entitled to know whether Tillman,* the accomplice witness, *was or had been a drug addict or had used narcotics on the day of the alleged crime, it being a very important factor going to the general reliability of his testimony.* The refusal of the court in this case to permit cross-examination along such lines was prejudicial and reversible error." (Emphasis added.) *People v. Crump* (1955), 5 Ill. 2d 251, 261-62, 125 N.E.2d 615.

Following *Crump*, the supreme court decided *People v. Hamby* (1955), 6 Ill. 2d 559, 129 N.E.2d 746. In *Hamby*, the defendant was found guilty following a bench trial of the unlawful sale of heroin to Vivian Barrymore, an admitted narcotics addict. The evidence established that Barrymore, while under the surveillance of police officers who had searched her and found her to be free of narcotics and who

had furnished her with five marked one dollar bills to purchase narcotics, entered Hamby's apartment, returned and gave the narcotics she purchased from Hamby to the waiting surveilling officers. Discussing the effect of narcotics addiction on a witness' credibility, the supreme court stated in *Hamby*:

> "It is true that Vivian Barrymore was, by her own testimony, a narcotics addict, and that fact has an important bearing upon her credibility. (*People v. Crump*, 5 Ill. 2d 251, 261.) It is also true that while she was not technically an accomplice (*People v. Abair*, 102 Cal. App. 2d 765, 228 Pac. 2d 336,) her situation was sufficiently similar to that of an accomplice to warrant close scrutiny of her testimony for that additional reason." *People v. Hamby* (1955), 6 Ill. 2d 559, 562, 129 N.E.2d 746.

In *People v. Boyd* (1959), 17 Ill. 2d 321, 161 N.E.2d 311, the defendant was found guilty following a bench trial of selling narcotic drugs. Jeff Andrews and William Dantzler, the two persons to whom the defendant allegedly sold the drugs, were the State's two principal witnesses. Both witnesses admittedly were former drug addicts. The defendant's sole contention on appeal for reversal was that because the State's witnesses lacked credibility, the State's evidence did not establish the defendant's guilt beyond a reasonable doubt. The defendant's conviction was reversed by the supreme court, and in so doing, the court stated:

> "It is apparent that the judgment of conviction must stand or fall upon the testimony of Andrews and Dantzler. We have previously had occasion to consider the weight to be given the testimony of a narcotics addict who is a police informer. In *People v. Hamby*, 6 Ill. 2d 559, we held that *the fact that a witness is also a narcotics addict has an important bearing upon the credibility of the witness* and likewise held that while, technically speaking, a police informer who co-operates with the police to arrange for a sale of narcotics is not an accomplice, the situation of such a witness is sufficiently similar to that of an accomplice *to warrant close scrutiny of the witness's testimony*. In *People v. Crump*, 5 Ill. 2d 251, we quoted with approval the following language from *State v. Fong Loon*, 29 Idaho 248, 158 Pac. 233: '*Habitual users of opium or other like narcotics become notorious liars. The chronic morphino-maniac is often a confirmed liar—the truth is not in him.* The capacity of a witness to observe and to receive accurate impressions, to retain them in his memory, and to correctly relate them, also his power and inclination to be truthful, are all subjects which go

to the credibility of a witness.' " (Emphasis added.) *People v. Boyd* (1959), 17 Ill. 2d 321, 326, 161 N.E.2d 311.

John Lenier was searched and found to be free of narcotics by Chicago police officers in *People v. Bazemore* (1962), 25 Ill. 2d 74, 182 N.E.2d 649. The officers gave Lenier $10 in currency after recording the serial numbers. Lenier went to a pool hall and, he testified, purchased narcotics from the defendant. Lenier testified further that he returned to the officers and gave them the narcotics. The officers went to the pool hall to arrest the defendant but did not find him. The defendant was arrested two months later, charged with selling drugs to Lenier and was found guilty.

The supreme court stated that the issue presented was whether the uncorroborated testimony of a narcotics addict was sufficient to convict. The supreme court pointed out that because Lenier was admittedly an addict *"He was thus subject to the moral depravity commonly associated with narcotics addiction."* (Emphasis added.) (*People v. Bazemore* (1962), 25 Ill. 2d 74, 77-78, 182 N.E.2d 649.) Reversing the defendant's conviction, the court held:

> "Where, as here, the State's case rests solely upon the credibility of an admitted narcotics addict, a trial court, and in the final analysis this court, must carefully and closely scrutinize the testimony of the witness. (*People v. Boyd*, 17 Ill. 2d 321; *People v. Hamby* 6 Ill. 2d 559.) Although it does not necessarily follow that his testimony must be disbelieved, (*People v. Barney*, 15 Ill. 2d 503,) *the fact that a witness is a narcotics addict has an important bearing on his credibility. (People v. Crump,* 5 Ill. 2d 251.) Nor, as the People assert, is credibility affected only when it is shown that the witness was under the influence of narcotics at the time of the occurrence to which he testifies, or at the time of trial. *For in addition to the effect addiction may have on capacity of the witness to observe, to receive accurate impressions and to retain them in his memory, the courts may consider, too, the effect of addiction upon the power and the inclination of the witness to be truthful. (People v. Boyd,* 17 Ill. 2d 321.)" (Emphasis added.) *People v. Bazemore* (1962), 25 Ill. 2d 74, 76-77, 182 N.E.2d 649.

In *People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469, the officers observed the defendant with George Lincoln, whom the officers had previously searched and found free of narcotics and to whom the officers had given $10 in marked and recorded currency. Lincoln testified that the defendant sold him narcotics for the $10, $9 of which was found on the defendant when he was arrested shortly

after he departed from Lincoln.

The officers testified that the defendant admitted the sale when he was questioned at police headquarters. A jury convicted the defendant and on appeal, one of his assignments of error for reversal was that his tendered instruction on the credibility of the narcotics addict witness (Lincoln) was improperly refused. Lincoln testified at trial that he had not used drugs within six months prior to trial. He admitted using narcotics during the month the events to which he testified allegedly occurred. Although the court stated that an instruction on the credibility of Lincoln was clearly proper, the court held that the defendant's tendered instruction was properly refused because it incorrectly instructed the jury to find the defendant not guilty if the testimony of the narcotics addict did not convince them beyond all reasonable doubt of the defendant's guilt.

The court pointed out that in determining guilt or innocence, the jury was not confined to a consideration of only the addict's testimony, but that the jury should also consider all the evidence—the officers' corroborative testimony, the defendant's admission and the recovery of the marked currency from the defendant. The court held that the limiting language of the defendant's tendered instruction rendered it improper and that the trial court correctly refused it. The court further held:

> "Moreover the court gave a proper instruction on that phase of the case. It instructed the jury that the testimony of an addict is to be scrutinized with great caution and if the jury were to find that a witness was an addict or used narcotics at about the time of the alleged crime, such finding would be an important factor going to the general reliability of the addict. *People v. Perkins*, 26 Ill. 2d 230, 186 N.E.2d 330; *People v. Bazemore*, 25 Ill. 2d 74, 182 N.E.2d 649." *People v. Phillips* (1970), 126 Ill. App. 2d 179, 187, 261 N.E.2d 469.

The trial court in the case at bar should have similarly instructed the jury. It was reversible error for it not to have done so. In refusing the defendants' tendered instruction, the trial court stated that it had read the *Phillips* opinion. However, it is apparent from the above stated language in *Phillips* that the defendants' tendered instruction in this case that "you may consider evidence that a witness was addicted to drugs in judging that witness' credibility" was proper and should have been given.

The trial judge also stated in refusing the defendants' tendered instruction that he had read *Collins*. There are two *Collins* decisions, *People v. Collins* (1977), 48 Ill. App. 3d 643, 362 N.E.2d 1118 (*Collins*

*I*) and *People v. Collins* (1977), 51 Ill. App. 3d 993, 367 N.E.2d 504 (*Collins II*). The trial judge did not specify which *Collins* he had read.

In *Collins I*, a jury found the defendant guilty of the felony theft of various articles which were in plain view in the defendant's record shop. The articles had been stolen in numerous residential burglaries. One of the State's witnesses was addicted to drugs. The defendant tendered a modified IPI Criminal No. 3.17, which inserted the word "addict" in place of "accomplice." The court stated that "the tendered instruction sought to inform the jury that the testimony of a narcotics addict should be scrutinized carefully and that the drug addiction is an important factor affecting the addict's general reliability. A similar instruction in *People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469, was held to be overbroad and properly refused." *People v. Collins* (1977), 48 Ill. App. 3d 643, 650, 362 N.E.2d 1118.

But the court did *not* refuse a similar instruction in *Phillips*. The defendant's tendered instruction which the court disapproved in *Phillips* was that "[t]he jury must look upon the testimony of a narcotic addict with great suspicion, and act upon it with great caution, and unless the jury is satisfied *from such evidence* of the guilt of the defendant beyond all reasonable doubt, it is the sworn duty of the jury to return a verdict of not guilty." (Emphasis in original.) *People v. Phillips* (1970), 126 Ill. App. 2d 179, 186, 261 N.E.2d 469.

It was not because this instruction was "overbroad" that the court in *Phillips* held that it was properly refused. Rather, the court so held because the instruction directed the jury "to find the defendant not guilty if the testimony of the addict [did] not convince them beyond all reasonable doubt of the defendant's guilt," where there was additional evidence to the addict's testimony for the jury to consider and on which it could find the defendant guilty. The could held in *Phillips* that it was this "limiting language of the instruction in question [which] rendered it improper." *People v. Phillips* (1970), 126 Ill. App. 2d 179, 186-87, 261 N.E.2d 469.

In *Phillips*, the trial court gave an instruction practically identical to the refused tendered instruction in *Collins I*. This instruction was upheld by the appellate court, which stated, "Moreover the court gave a proper instruction on that phase of the case. It instructed the jury that the testimony of an addict is to be scrutinized with great caution and if the jury were to find that a witness was an addict or used narcotics at about the time of the alleged crime, such finding would be an important factor going to the general reliability of the addict." *People v. Phillips* (1970), 126 Ill. App. 2d 179, 187, 261 N.E.2d 469.

The court held in *Collins I* that the defendant's tendered instruc-

tion that the testimony of a narcotics addict should be scrutinized carefully and that drug addiction is an important factor affecting the addict's general reliability was overbroad because it would unreasonably single out the testimony of the addict. (*People v. Collins* (1977), 48 Ill. App. 3d 643, 650, 362 N.E.2d 1118.) This language, however, is irreconcilable with the language in *Crump, Hamby, Boyd, Bazemore* and *Phillips*. Those cases held that a defendant has a right via an instruction to single out the testimony of a narcotics addict. Additionally, the court's language in *Collins I* that the instruction "would unreasonably single out the testimony of the addict [witness]" is irreconcilable with IPI Criminal No. 3.17, which singles out the testimony of an accomplice witness.

The defendants' tendered instruction in the case at bar simply told the jury that "[y]ou may consider evidence that a witness was addicted to drugs at the time of the crime in judging that witness' credibility." This instruction does not "unreasonably single out the testimony of the addict," rather, it reasonably and correctly instructs the jury that it may properly consider narcotics addiction in judging a witness' credibility.

In *People v. Collins* (1977), 51 Ill. App. 3d 993, 367 N.E.2d 504, *Collins II*, the defendant was found guilty by a jury of the theft of a microwave oven. The trial judge refused the defendant's tendered instruction that "[y]ou have before you testimony from a witness who admits having been addicted to drugs. The testimony of such a witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (51 Ill. App. 3d 993, 998, 367 N.E.2d 504.) Rejecting the defendant's contention that refusal to give this instruction was reversible error, the appellate court summarily stated:

> "It is the contention of the defendant that the giving of an instruction cautioning the jury against the use of the testimony of a drug addict is required by a reading of *People v. Phillips* (1st Dist. 1970), 126 Ill. App. 2d 179, 261 N.E.2d 469. This court considered this same issue in the defendant's appeal of a previous conviction. Therein we determined that the trial court properly refused the defendant's tendered instruction (*People v. Collins* (3d Dist. 1977), 48 Ill. App. 3d 643, 362 N.E.2d 1118), and we find nothing in this case which would warrant a different result." *People v. Collins* (1977), 51 Ill. App. 3d 993, 998, 367 N.E.2d 504.

It should be again noted that the defendants' tendered instruction in the case at bar did not inform the jury that the testimony of an

addict witness is subject to suspicion or should be considered by the jury with caution or that it should be carefully examined. The defendants requested simply that the jury be instructed that it could consider evidence that a witness was addicted to drugs in judging that witness' credibility. As the court stated in *People v. Franz* (1977), 54 Ill. App. 3d 550, 555, 368 N.E.2d 1091, "An instruction informing the jury that it could consider the evidence that a witness was addicted to drugs at the time of the crime in judging that witness' credibility would have been proper. (*People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469.)"

For the reasons stated, I am of the opinion that the trial court committed reversible error when it refused the defendants' instruction. I would therefore reverse the defendants' convictions and remand the cause for a new trial.